UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

STEVEN W. CASKEY                          CIVIL ACTION

VERSUS                                    NO. 3:18-Cv-694-JWD-RLB

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

**PLAINTIFF'S OPPOSITION TO PRUDENTIAL'S STATEMENT OF FACTS IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff submits the following response to Prudential's statement of material facts:

1. Plaintiff Steven W. Caskey ("Plaintiff"), age 49, is a former shift supervisor of Occidental Petroleum Corporation ("Oxy"). (PRU 77212-002059-000218 to 224[1]

**Admitted.**

2. Oxy is the plan sponsor and plan administrator for the Occidental Petroleum Corporation Welfare Plan (the "Plan") that provided, among other benefits, long-term disability ("LTD") benefits to eligible participants in the Plan. (000001 to 21; 000206.)

**Admitted.**

3. The Plan consists of the Occidental Petroleum Corporation Welfare Plan ("Oxy Wrap"), the Oxy Long-Term Disability Summary Plan Description ("Oxy SPD"), the Oxy, Inc. Group Contract G-50262-TX, including applicable amendments ("Group Contract"), and the Long-Term Disability Booklet Certificate, including applicable rider, ("LTD Booklet Certificate"). (*See* 000004 (Oxy Wrap at Section 1.2).)

**Denied.  The Summary Plan Description is not the plan – it's a description of the plan.**

4. The Plan is governed by the Employment Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001 et seq. (000206-211.)

**Admitted.**

5. The Plan also states that "[t]he Plan shall be construed, administered and governed in all respects under the applicable laws of the State of Delaware, except to the extent preempted by federal law, or governed by the applicable insurance law." (000013.)

**Denied. Batesnumber 13 does not contain a choice of law provision.  To the extent Prudential**

**relies on the wrap plan to point to a Delaware choice of law provision, AR 19, that provision is**

**unenforceable because it states that is governed by Delaware "except to the extent preempted**

by federal law, or <u>governed by the applicable insurance law</u>." <u>Id</u>.  The applicable insurance law here is Texas, as the Group Policy makes clear that the disability plan's insurance policy is governed by the laws of the state of Texas. <u>AR 152</u>; <u>AR 151</u>.

6. Prudential is the claims fiduciary and claims administrator for LTD benefit claims brought pursuant to the terms and conditions of the Plan. (000056; 000207.)

**Admitted.**

7. Prudential also insures LTD benefits payable under the Plan. (000151; 000207.)

**Admitted.**

8. Plaintiff seeks unpaid LTD benefits pursuant to the terms and conditions of the Plan. (ECF No. 1, *passim*.)

**Admitted.**

9. The Oxy Wrap states: "[t]he following documents are hereby incorporated by reference into and shall be part of the document governing this Plan: (1) Plan documents governing each Benefit Program. These documents shall provide, among other things, rules relating to the Coverage Options available under each such Benefit Program, the benefits available under each Coverage Option, and the rules governing eligibility for such benefits." (000002.)

**Denied.  Batesnumber 2 does not contain the above information.**

10. The Oxy Wrap further provides: "[t]he Plan Administrator shall have the exclusive right to interpret the terms and provision of the Plan and to resolve all questions arising thereunder, including without limitation the right to resolve and remedy ambiguities, inconsistencies, or omissions in the Plan. . . . All findings of fact, interpretations, determinations, and decisions of the Plan Administrator with respect to any matter or question arising under the Plan, shall be final, conclusive, and binding upon all persons having or claiming to have any interest in or right under the Plan, and shall be given the maximum possible deference allowed by law." (000013.)

**Admitted.**

11. The Oxy Wrap also provides: "[a]dditional named fiduciaries may be designated and their respective functions delineated in the applicable summary plan descriptions." (000013.)

**Admitted.**

12. The Oxy SPD states: "Prudential, as the Claims Administrator, will decide your claims and appeals. Prudential has exclusive discretionary authority to interpret LTD Plan provisions as well as to determine facts and other information related to claims and appeals. Prudential's decisions are conclusive and binding." (000056.)

**Admitted. However, Texas's ban on discretionary clauses nullifies this attempt to grant discretionary authority.** *See* **Tex. Ins. Code Ann. § 1701.062; 28 Tex. Admin Code § 3.1201** *et seq.***; Curtis v. Metro. Life Ins. Co., 2016 WL 2346739, at \*1 (N.D. Tex. 2016); Ravannack v. United Healthcare Ins. Co., 2015 WL 2354186, at \*2 (E.D. La. May 15, 2015)(discretionary authority clauses in insurance policies delivered in Texas are prohibited). Further, Prudential may not be granted discretion in a SPD. See e.g. Durham v. Prudential Ins. Co. of Am., 890 F. Supp. 2d 390, 395 (S.D.N.Y. 2012)(explaining that the SPD is not the plan and therefore a grant of discretionary authority made in a SPD does not actually grant discretionary authority).**

13. The Oxy SPD also states that "[i]f a conflict exists between a statement in this summary and the provisions of the Plan document or any applicable contract, the Plan document will govern." (000057.)

**Admitted.**

14. The Supplement SPD attached to the LTD Booklet Certificate further states: "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contact, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." (000207.)

**Admitted. However, Prudential may not be granted discretion via a summary plan description, as an SPD is not the plan. Durham v. Prudential Ins. Co. of Am., 890 F. Supp. 2d 390, 395 (S.D.N.Y. 2012)(explaining that the SPD is not the plan and therefore a grant of discretionary authority made in a SPD does not actually grant discretionary authority); Ringwald v. Prudential Ins. Co. of Am., 609 F.3d 946, 949 (8th Cir. 2010)(same); Nieves v. Prudential Ins. Co. of Am., 233 F. Supp. 3d 755, 760 (D. Ariz. 2017)(same)**

15. Under the terms of the Plan, "disability" is defined as follows:

You are disabled when Prudential determines that:
you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
you have a 20% or more loss in your **monthly earnings** due to that sickness or injury.
After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:
• you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience; and
• you are under the regular care of a doctor.
(000178 (emphasis in original).)

**Admitted.**

16. "Regular occupation" means "the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.*)

**Admitted.**

17. Material and substantial duties" means "duties that: are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." (*Id.*)

**Admitted.**

18. The Plan further provides:

We will stop sending you payments and your claim will end on the earliest of the following:

1. During the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to; after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to.

. . .
3. The date you are no longer disabled under the terms of the plan.
(000186.)

**Admitted.**

19. The Plan defines how much Prudential will pay if a claimant is disabled and not working, stating:
We will follow this process to figure out your monthly payment:
1.  If you are enrolled for Option 1, multiply your monthly earnings by 50%. But, if you are enrolled for Option 2, multiply your monthly earnings by 60%.

2. The maximum monthly benefit is $15,000.
3. Compare the answer in item 1 with the maximum monthly benefit. The lesser of these two amounts is your gross disability payment.
4. Subtract from your gross disability payment any deductible sources of income.
(000180-181 (emphasis in original).)

**Admitted.**

20. With respect to "deductible sources of income," the Plan provides:

Prudential will deduct from your gross disability payment the following deductible sources of income:
. . .
(3) The gross amount that you, your spouse and children receive or are entitled to receive as loss of time disability payments because of your disability under:
(a) the United States Social Security Act; . . . .
(000182-183.)

**Admitted.**

21. With respect to Prudential's right to recover overpayments, the Plan states:

What Happens If Prudential Overpays Your Claim?

Prudential has the right to recover any overpayments due to:

• fraud;

• any error Prudential makes in processing a claim; and

• your receipt of deductible sources of income.

You must reimburse us in full. We will determine the method by which the repayment is to be made.

(000197-198.)

 **Admitted that the plan so states.**

22. Plaintiff ceased working as a shift supervisor on October 23, 2014. (000229.)

**Denied.  Prudential notes in several places in the record that he has been out of work since October 22, 2014. <u>AR 1346</u>;  <u>AR 1345</u>; <u>AR 1347</u>.  Prudential also claims that his last date of work was on October 19, 2014.  <u>AR 1352</u>.  Thus, his last date of work was on either October 22, 2014 or October 19, 2014.**

23. On March 26, 2015, Plaintiff submitted a claim for LTD benefits, citing depression, anxiety and attention deficit disorder. (000229-233.)

**Admitted. However, his depression, anxiety, and attention disorder was caused by his severe tinnitus. Before his hearing damage began, Caskey had no history of attention deficit disorder, anxiety, or depression. These symptoms began because the constant ringing and chirping in his ears caused lack of sleep, difficulty in speaking, difficulty concentrating, etc.**

24. In connection with his claim, Prudential submitted an Attending Physician Statement from Plaintiff's treating clinical neuropsychologist, John Bolter, PhD, dated March 24, 2015. (000234-235.) Dr. Bolter's APS noted a diagnosis of "depression/anxiety, ADHD, NOS," but stated "N/A" in response to his "date first unable to work," with a specific note that "I didn't disable him." (000234.) Dr. Bolter also checked "no" in response to the question "Did you advise your patient to stop working?" and, in response to the question "Please describe any restrictions or limitations and return-to-work plans," stated, "I have not restricted him from working." (*Id.*)

**Admitted. It is true that Dr. Bolter initially did not tell Caskey to stop working. The decision to go on disability benefits was made by Caskey, as he was the one suffering from constant ringing, chirping sounds as well as the cognitive impairment caused by his hearing loss. He also was aware that his job at the plant was causing his hearing loss. Although Dr. Bolter did not tell initially tell him that he had to stop working, Dr. Bolter has been fully supportive of Caskey's claim throughout this process.**

25. Dr. Bolter then provided an updated APS on May 8, 2015. (000405-407.) Dr. Bolter checked "no" in response to the question "Did you recommend this patient to be off work?" (000405.) He checked "no" in response to the question "Has a return to work date been discussed with the patient?" and stated the return to work target date was "not established but expect 6 months at least." (000406.)

**Admitted. As explained above, Dr. Bolter did not initially tell Caskey to stop working but he has also been fully supportive of his disability given Caskey's debilitating symptoms.**

Caskey's records demonstrate that he has always wanted to return to work but his tinnitus prevented him from returning to his regular occupation at the plant given that this job required frequent communication and exposure to loud noise.  **AR 436-442.**

26. On May 29, 2015, Susan Kelley, RN and Behavioral Health Consultant, reviewed Dr. Bolter's submissions and Plaintiff's medical records submitted in support of his claim. (001347-1348.) In connection with her review, Nurse Kelley noted that Dr. Bolter's May 8, 2015 APS contradicted his May 4, 2015 medical records, which noted Plaintiff's "brighter presentation," that he reported he was "able to tolerate social situations," his "sleep [was] improving," he had "normal speech and "thoughts [were] normal," his "insight/judgment [was] intact, and "there [was] no acute depression, anxiety or agitation." (001348.) Thus, she opined that, although Plaintiff appeared to have been limited by an unstable mood from his date of disability through May 4, 2015, his prognosis was good and that Prudential should consider an updated review of his claim in early June. (*Id.*)

Admitted, and this is a clear example of cherry picking.  Nurse Kelley also notes several things that are very much supportive of his disability claim, which Prudential fails to mention in this statement of fact. For example, "poor memory and poor sleep . . . crying during office visit . . . reports episodes of agitation and being in a bar fight . . . again tearful . . . limitations in regards to intellect, borderline mentally defective range academically … clear evidence of auditory attention . . . tearful during multiple office visits . . . agitated and argumentative which would limits ability to interact consistently and appropriately as a supervisor of staff . . ." **AR 1347-1348.**

Significantly, Nurse Kelley supports Caskey's disability claim.  Indeed, she notes that Caskey's records demonstrate that he is agitated and argumentative and ADD testing confirmed ADHD, which Nurse Kelly explains that he would be limited in his ability to interact consistently and appropriately as a supervisor of staff.  **AR 1346.**

27. By letter dated June 1, 2015, Prudential approved Plaintiff's LTD claim, effective April 22, 2015. (001224-1228; 001348-1349.) Prudential noted in its internal SOAP notes that it planned to obtain updated records in June for its continued review. (001348-1349.)

Admitted.

28. In line with Nurse Kelley's recommendations, Prudential continued its review of Plaintiff's claim and received an Activities of Daily Living Questionnaire ("ADLQ") and updated medical records. (*See* 001349-1352.)

**Denied, as the documents Prudential is citing to are not the ADLQ nor the medical records.**

29. Plaintiffs' July 21, 2015 ADLQ stated he was prevented from returning to work due to anxiety, depression, lack of concentration, memory loss, tinnitus, encephalopathy, organic parasomnia,[2] and ADHD. (000412-420.) However, he noted that he was able to prepare meals, drive, and do chores, and that he reads, watches TV, fishes, hunts, and uses the computer for e-mail. (*Id.*)

**Denied as written.  When asked if he prepares meals he replied "sometimes."  AR 414.  He explained that he drives two to three times per week.  Id.  He also checked that he performed other activities but performing such activities does not mean that he has the functional capacity to perform his previous, safety-sensitive position at the Oxy Plant.**

30. On August 28, 2015, Nurse Kelley again reviewed the updated information and concluded that Plaintiff's "current function remain[ed] unclear" and that Prudential should consider a referral for a psychiatric independent medical exam ("IME"). (001350.)

**Admitted that this is what the claims note says. Denied to the extent that Caskey's functional ability was unclear, as he has been unable to perform his job as a shift supervisor since suffering from hearing damage, particularly when his job caused such damage in the first place.**

31. Prudential ultimately did not schedule an IME because Plaintiff told Prudential he was not comfortable attending an IME and Prudential determined that was not unreasonable; instead, it decided to obtain updated behavioral health and Ear Nose Throat ("ENT") medical records to refer back to a clinician for another review. (*Id.*)

**Admitted.**

32. Prudential received records from, Stanley Peters, MD, an otolaryngologist who was treating Plaintiff for tinnitus and ear chirping. (*See* 000350-364.) Those records noted that Plaintiff was healthy, well-nourished, well-groomed; had normal communication without aids; he was oriented to time, place and person; and both of his ears appeared normal (inside and out); and he complained of tinnitus for three years. (000351; 000354; 000355; 000357-362.) Dr. Peters

diagnosed Plaintiff with tinnitus and asymmetrical hearing loss. (000351.) He recommended Plaintiff obtain hearing aids with tinnitus features and to wear ear protection around any excessive noise, but did not recommend Plaintiff stop working. (000355.)

**Denied.  Prudential is clearly cherry-picking.  Indeed, such records demonstrate "tinnitus, asymmetrical sensorineural hearing loss, dizziness and giddiness, difficulty speaking. . . encephalopathy, organic parasomnia " AR 350. His record also notes "hears ringing constantly in ears. . ." AR 351.  "Pt states he has been having ringing in chirping in both ears." AR 353.**

33. Prudential also received records from Dr. Bolter, which indicated Plaintiff was showing signs of benefit from medication. (*See* 000454 (December 2, 2015 Note stating "His activity level remains engaged. Overall, his mental health continues to improve with his current medications and cognitive-behavioral counseling under Dr. Cole's therapy."); 000474 (September 2, 2015 Note stating "In general, he is beginning to show signs of benefits of medication.").)

**Admitted in part denied in part.  While Dr. Bolter did note at the time that he was showing signs of benefits of medication, his tinnitus and hearing damage persisted, which is the main reason he is not able to perform his previous job duties.  Additionally, this record is dated December 2, 2015. On this same office visit, Dr. Bolter notes that "working on getting used to his hearing aid which is somewhat problematic at this point." AR 457.  Then in his next appointment dated December 16, 2015 his records indicate that he was having continuing difficulty adjusting to his hearing aids and that he is "limiting himself from environments in which numerous people may be present, such as a restaurant or large store, because he has some worry about he will copy with these settings." AR 448.  His record on January 20, 2016 states "his attention span is reduced as he feels he is paying too close attention to the sound [of the hearing aids]." AR 443.  Then on February 2, 2016 his records note unable "to get rid of the tinnitus causing severe problems." AR 436.**

34. Prudential also received records from Brooke Cole, PhD, a clinical psychologist, who noted Plaintiff's mental health was stable. (*See* 000460 (November 15, 2015 Note stating "His outward presentation today again displays significant improvement. . . . Overall, his mental

health continues to display markers of stability"); 000465 (October 15, 2015 Note stating "His outward presentation today again displays significant improvement . . . Overall, his mental health continues to display markers of stability"); 000470 (September 15, 2015 Note stating "His outward presentation today displays significant improvement. . . . Overall, his mental health appears stable.").)

**Admitted in part and denied in part.  While Dr. Cole notes that his mental health was stable on this occasion, as noted above, her records also demonstrate that his severe tinnitus was causing severe problems. AR 436 and that he was having difficulty adjusting to his hearing aids.  AR 448.  Her records also demonstrate "continuing difficulty with tinnitus, chirping, and hearing loss . . . worse in settings with large groups of people or loud noises . . . anxiety is low in one-on-one settings but otherwise the anxiety can return very easily." AR 470.**

35. Following submission of the updated medical records, on January 12, 2016, Gary McCollum, RN performed a medical review. (001352.) With respect to Plaintiff's physical complaints, Nurse McCollum explained: (1) Plaintiff's main complaint for not returning to work was tinnitus/chirping in his ears, which Plaintiff had reported for the last three years and worked with without issue; (2) hearing aids would not inhibit Plaintiff's functionality; and (3) Plaintiff should wear ear protection in loud environments. (*Id.*)

**Admitted in part and denied in part. Plaintiff admits that Prudential's in-house nurse stated that Plaintiff's main problem was his hearing. However, he did not explain that he had "worked without issue" during the last three years.  As noted in one of his medical records on October 14, 2014:**

> **now has constant chirping in his hearing. He hears it equally out of both ears . . . he feels tired all the time . . . <u>He has two to three hours of sleep at night . . . He will go to work and feel like a zombie . . . He has had to lead meetings and lately has noticed that he sometimes cannot complete his sentences</u> . . .**

**AR 335. Caskey further explained to Prudential that the ringing and chirping he hears made it very difficult to concentrate at work and, due to lack of sleep, he would show up at work feeling like a zombie. AR 1426-1427.  He also explains that he cannot wear hearing aids and ear plugs simultaneously at the plant, where he was routinely exposed to loud noises. AR 1426-1427.**

**Thus, this in-house's nurse's statement that he was working without any problem is clearly wrong.**

36. With respect to Plaintiff's mental/behavioral health complaints, Nurse McCullum explained that the records revealed Plaintiff's behavioral health in a stable condition and he no longer had supported behavioral health restrictions or limitations as of November 15, 2015 when Plaintiff successfully showed stability of mood for a period of two months. (*Id.*)

**Admitted that this is what is stated in in-house Nurse McCollum's claim notes, but denied that this is a reasonable statement. Indeed, anyone suffering from a constant ringing and chirping in their ears would be distracted and have difficulty focusing. Additionally, the sounds keep Caskey up at night, which leaves him tired during the day, which contributes to his memory problems and inability to focus, as would be expected to anyone who is not getting restful sleep.**

37. Relying on Nurse McCollum's review, Prudential terminated Plaintiff's claim effective January 18, 2016 because it determined the medical records did not support impairment that would prevent him from performing the material and substantial duties of his regular occupation. (001254-1259.)

**Admitted that Prudential terminated his benefits but there are several statements that are inaccurate in this denial letter. For example, Prudential states that his most recent evaluation with Dr. Cole was on November 16 ,2015, when actually at the time Prudential was aware of Dr. Cole's office visits in December 2015 in which she notes that he is "limiting himself from environments in which numerous people may be present, such as a restaurant or large store, because he has some worry about he will copy with these settings." AR 448. Additional records from Dr. Cole demonstrate continued difficulty concentrating/anxiety/depression associated with his hearing damage, as discussed above. Significantly, Prudential leaves out many aspects of his medical records that support continued disability such as "clear evidence of poor auditory attention with the BTA;" "borderline mentally defective range;" etc. AR 1429-1430.**

38. On January 27, 2016, Plaintiff appealed arguing he was still unable to perform the duties of his job. (000888). He did not submit any additional evidence in support of his claim. (*Id.*)

**Admitted that Caskey submitted an appeal by letter of January 27, 2016 based on his conversation with Prudential's claims person. The claims person led him to believe that all he had to do was send in a letter saying that he was appealing and that would suffice to get his benefits approved.**

39. Following the appeal, Prudential requested updated records from Plaintiff's treating physicians (*see* 001354) and, once they were received, requested independent medical file reviews by a board certified Otolaryngologist and a board certified Neuropsychologist (*see* 001266-1269).

**Denied, as it is unclear who requested Caskey's updated medical records based on the claims note cited by Prudential. Plaintiff further denies that the file reviews Prudential requested were "independent" as Prudential requested the file reviews from the University Disability Consortium, a third-party company with a well-known history of providing biased peer review reports for disability insurers. Indeed, Plaintiff submitted evidence to Prudential noting the peer reviewers were frequently retained by disability insurers and that the caselaw demonstrates that they consistently support a finding of "not disabled." __AR 565.__ Plaintiff also provided evidence that UDC has stated that one of the benefits of hiring UDC to conduct reviews are that "improved denial and closure rates and reduced costs are a probable result." __AR 882.__**

40. Updated records from Dr. Peters did not indicate any changes to the status with complaints of tinnitus. (*See* 000422-425 (Plaintiff complaining of tinnitus and hearing loss).)

**Admitted because his severe tinnitus and hearing loss continues. Prudential also fails to mention that his records also demonstrate that "not sleeping, chirping to bilateral ears, describes a shock wave feeling in my head when he wakes up." __AR 424.__  His records also note**

that he was suffering from dizziness, difficulty speaking, tinnitus, sensorineural hearing loss.

**AR 426.**

41. Updated records from Dr. Bolter did not indicate any changes to his mental/behavioral health status. (*See* 000436 (February 2, 2016 Note stating "He had been doing a bit better but has never really been able to get rid of the tinnitus . . . . He was seen today for medication management and psychotherapy").)

**Admitted, and significantly, this record notes that Dr. Bolter states that his tinnitus is causing**

**"severe problems, particularly at night when he is trying to sleep." AR 436.**

42. Updated records from Dr. Cole also indicated his mental/behavioral health was stable. (*See* 000433 (January 20, 2016 Note stating "His outward presentation today is stable. His mood is euthymic, affect is broad and appropriate."); 000448 (December 16, 2015 Note stating "His outward presentation today is stable. His mood is euthymic, affect is broad and appropriate.").)

**Denied. Batesnumber 433 is from the Hearing Center and notes "shock wave feeling in**

**head, dizziness, not sleeping, tinnitus . . ." The January 20, 2016 note from Dr. Cole**

**actually notes that "difficulty adjusting to hearing aids . . . his attention span is reduced . . .**

**paying too close attention to the sound. AR 443. His December 16, 2015 record notes that**

**he is having difficulty adjusting to his hearing aids. AR 448.**

43. On April 6, 2016, board-certified otolaryngologist Ronald M. Grossman, MD, completed his review. (000951-956.) Dr. Grossman noted that Plaintiff had mild to moderate hearing loss and that he agreed with Dr. Peters' recommendation for hearing aids that would not only help his hearing loss, but would also help suppress his tinnitus. (000954-955.) He concluded that Plaintiff had no restrictions and limitations that would prevent his functioning from January 19, 2016 forward but he recommend Plaintiff wear ear protection around excessive noise. (000951-956.)

**Admitted in part and denied in part. While Dr. Grossman's report is dated April 6, 2016,**

**Prudential omits several important statements made by Dr. Grossman. For example, Dr.**

**Grossman admits that Caskey is "at best a borderline candidate for amplification …he has**

**worked in a factory where higher noise levels would be expected." AR 954-955. Dr.**

Grossman also notes that "noise exposure is the cause of his hearing loss." **Id**.  Yet Dr.

Grossman unreasonably suggests that he should have no restrictions from returning to

work, which is what caused Caskey's hearing loss in the first place.  Dr. Grossman also

suggests his only restriction is to where ear protection around excessive noise.

As explained to Prudential in Caskey's appeal, Dr. Grossman has a well-documented

history of providing opinions for disability insurers that support a finding of "not

disabled." **AR 565**.

44. The same day, board-certified neuropsychologist, Milton Jay, Ed.D, also completed his
review. (000957-963.) He concluded Plaintiff had mild, chronic and residual symptoms of
depression and anxiety from January 19, 2016 forward, but these symptoms were not severe
enough to require restrictions. (000961.) He also concluded there was insufficient evidence to
support any cognitive disorder that would require restrictions. (*Id.*) Dr. Jay acknowledged
Plaintiff's treating neuropsychologist, Dr. Bolter's February 2015 medical record referenced
certain cognitive and psychiatric testing from February 2015 with abnormal findings;
however, Dr. Jay disagreed with Dr. Bolter's findings because the testing was unreliable as
no actual report or raw test data were provided, Dr. Bolter failed to identify all of the tests
administered and there was no evidence validity testing was even performed during testing.
(*Id.*)

Admitted in part and denied in part.  While Dr. Jay states that Caskey should not have any

limitations due to his inability to concentrate, this opinion is unreasonable, as it was

directly contrary to the evidence in Caskey's medical records, including consistent reports

of poor memory due to lack of sleep, depression, anxiety, and inability to concentrate. **AR
564**.  While Dr. Jay takes issue with Dr. Bolter's testing that shows Caskey as borderline

mentally defective, it is important to note that such testing occurred at a time when Caskey

had no idea that Prudential would be terminating his disability benefits, which contradicts

Dr. Jay's suggestion that the testing was unreliable.

As explained to Prudential in Caskey's appeal, Dr. Jay has a well-documented history of

providing opinions for disability insurers that support a finding of "not disabled." **AR 565**.

45. Thus, on April 12, 2016, Prudential upheld its decision to terminate Plaintiff's LTD benefits claim because Prudential determined there was insufficient information to support impairment that would prevent Plaintiff from performing the material and substantial duties of his regular occupation. (001270-1274.)

**Admitted that Prudential denied Caskey's first appeal on this date but it is denied that this decision was reasonable.  In this statement Prudential suggests that Caskey should be able to wear hearing protection while performing his job.  However, Prudential's own vocational consultant stated that Caskey's need for hearing protection, along with this hearing damage, and the fact that his job required frequent communication and loud noise, renders Caskey unable to perform his regular occupation.  Further, Caskey explained to Prudential that he cannot wear his ear plugs and his hearing aids simultaneously, which Prudential has unreasonably ignored.  AR 1426-1427.**

46. On July 15, 2016, Plaintiff submitted a second voluntary appeal. (000563-566.) He submitted a declaration from Plaintiff that stated he could not perform his job due to fatigue, inability to concentrate and poor short term memory and that he could not work because he could not wear hearing aids and ear plugs at the same time; a letter of support from his girlfriend; a July 14, 2016 mental residual functional capacity assessment completed by Dr. Bolter; information regarding working at a chemical plant; and plan documents. (000563-885.)

**Admitted in part**.  **Plaintiff submitted a detailed appeal letter dated July 15, 2016 in which he also provided evidence of UDC's conflict of interest (a fact Prudential omits from its above statement). AR 563-566. Indeed, the vocational literature submitted to Prudential notes that his job required exposure to "constant loud noise." AR 576. Caskey also submitted an updated statement from Dr. Bolter in which he explains why Caskey is unable to work, which Prudential fails to mention.  AR 1422-1425.**

47. Dr. Bolter's July 14, 2016 Medical Residual Functional Capacity Assessment stated: (1) Plaintiff continues to have problems with anxiety and depression; (2) his prognosis was "poor"; and (3) his functioning was "marked." (000569-570). However, he stated Plaintiff's "frequency of treatment" was "monthly" and, in response to the question "Do you believe

that your patient can work on a regular and sustained basis in light of his or her mental impairment?," Dr. Bolter checked "no," but explained that "[h]e has serious problems related to abnormal hearing with significant problems." (000572.) Dr. Bolter did not mention any mental impairment in that explanation and also did not attach any data or updated medical records to his Assessment. (000569-570.)

**Admitted, and Prudential did not ask Dr. Bolter to attach data or updated medical records to his assessment. Significantly, Dr. Bolter also states that he does "not believe that patient can work on a regular and sustained basis." <u>AR 1425</u>. He also explains that Caskey is not a malinger, <u>AR 1422</u>, and that he has "serious problems related to abnormal hearing." <u>AR 1425</u>.**

48. In response to the second appeal, Dr. Grossman completed an addendum medical file review, which concluded that the additional documentation did not alter his prior assessment. (001049-1053.) He noted there were no new records containing any audiologic evaluations, noise level studies of the Plaintiff's previous work environment, nor any new self-reported limitations. (001050.) That being said, he elaborated on his previous restrictions and limitations, explaining that Plaintiff required noise protection utilizing both earplugs and external muffs in work areas where sound level approached or exceeded 105 dB; and 15 minute sound rest periods every two hours in areas of 105 dB or greater sound levels. (001053.) He further opined Plaintiff could safely return to his work environment with the outlined protection and rest periods. (*Id.*)

**Admitted that Dr. Grossman submitted an addendum, but Plaintiff denies that his opinion is reasonable. Significantly, Dr. Grossman reiterates that he believes that Caskey's hearing loss is due to noise exposure. <u>AR 1051</u>. He also states that "<u>Depending on the sounds levels in his prior work place</u>, he could safely return to that environment wearing the aforementioned protection with sound rest periods of 15 minutes every two hours." <u>AR 1053</u>. Significantly, Dr. Grossman states that Caskey would have to wear both ear plugs and ear muffs simultaneously, which is problematic given the fact that Caskey "cannot wear hearing aids and ear plugs at the same time … the hearing aid rests in the inside of [his] ear where the earplugs would have to be placed." <u>AR 573</u>.**

49. Dr. Jay also completed an addendum medical file review, which concluded that the new medical records did not alter his prior assessment and there was no basis for restrictions that would affect Plaintiff's functional capacity due to ADHD or depression/anxiety. (001054-1057.) Dr. Jay noted that both Dr. Bolter and Dr. Cole's treatment notes confirmed his symptoms were improving and that, although Dr, Bolter submitted a mental function capacity test, (1) he did not provide any evidence of clinical examination data of either ADHD or depression; (2) his conclusions were not supported by any data; (3) his assessment actually rated Plaintiff in the mild to moderate range of overall status; and (4) Dr. Cole's treatment notes from September 2015 through February 2016 noted mild depressive symptoms. (001056-1057.)

**Admitted that Dr. Jay provided an addendum, but Plaintiff denies that this addendum was reasonable. It is clear from this report that Dr. Jay is just trying to provide an opinion that supports the denial of Plaintiff's benefits. For example, he states that there is no evidence of attention deficit disorder or depression, when Caskey's actual medical records clearly provide his consistent reports to his doctor that he suffers from these ailments. Indeed, his doctor prescribed medication to treat these conditions, and his psychiatric testing demonstrates that Caskey is in the borderline mentally defective range. *See e.g*. Hardt v. Reliance Standard, 540 F.Supp. 2d 656 (E.D. Va. 2008) (medical decision to prescribe medication is objective evidence of a condition absent proof otherwise).**

50. Following Dr. Grossman's more specific outline of restrictions and limitations, Prudential requested a regular occupation review from its vocational specialist Gregg Schwartzkopf. (001359-1360.)

**Admitted.**

51. Mr. Schwartzkopf noted that Plaintiff's regular occupation is most similar to production supervisor, which requires frequent talking and hearing; it has noise levels that are classified as loud; and Plaintiff's hearing protection requirements would interfere with the communication required by his regular occupation. (001360.)

**Admitted.  In addition, Mr. Schwartzkopf also states that it would be difficult to leave the factory floor at specific intervals throughout the work day.  AR 1360.**

52. Based on the additional medical reviews and vocational review, Prudential reinstated Plaintiff's LTD benefits by letter dated November 17, 2016, effective January 19, 2016. (001289-1293.)

**Admitted. Significantly, Prudential explains that Caskey's job requires talking and hearing frequently and is performed in an environment with loud noises. AR 1292. Prudential also states that the level of hearing protection required would interfere with his ability to communicate and removing himself from loud noise areas at specific intervals throughout the work day would be difficult. Id.**

53. Shortly after reinstating Plaintiff's LTD benefits, Prudential received updated information from Oxy that (1) its production area's noise level was in the range of 85 to 100 dB, but rarely exceeds 100 dB; (2) all employees were required to wear hearing protection above 85 dB and supervisors did not need to wear hearing protection outside of the production areas; and (3) shift supervisors do not routinely work in areas above 100 dB, as most of their work time is spent in office control room type environments. (000891.)

**Denied. This statement is both false and purposefully misleading. The updated information from Caskey's employer was received approximately 5 months after Prudential reinstated benefits – not "shortly after" Prudential reinstated benefits. But more importantly, the updated information was requested from Prudential after Prudential reinstated benefits and after declaring that Caskey was disabled from performing his regular occupation for the duration of the own occupation period. Indeed, Prudential requested the information from Caskey's employer only 5 days before the end of the "regular occupation" period because it realized that it could not find alternative occupations that Caskey would qualify for that would meet the policy's earnings threshold.[1]**

---

[1] AR 1384-1385. Prudential's claim notes indicating that on 4/17/2017 Marisa Bourget wrote an email to Caskey's employees in which it asked several questions about how Caskey's job was performed.

54. Following receipt of this updated information regarding Plaintiff's regular occupation at Oxy, Prudential requested an addendum regular occupation review from Gregg Schwartzkopf. (001363-1364.)

**Admitted.**

55. Mr. Schwartzkopf concluded that, based on the additional information received from Plaintiff's employer, Plaintiff had the capacity to perform his regular occupation within the outlined restrictions and limitations. (001364.) He noted that, although the occupational environment is loud (over 80 dB), it rarely exceeds 100 dB, so he would not be exposed to 105 dB or greater sound levels and thus would have the capacity to perform his regular occupation within the outlined permanent restriction of Dr. Grossman. (001363-1364.)

**Denied. This is another purposefully misleading statement by Prudential. Nowhere in this report does Mr. Schwartzkopf "conclude … that Plaintiff had the capacity to perform his regular occupation within the outlined restrictions and limitations." All Mr. Scwartzkopf does is parrot back the information received from Caskey's previous employer. He does not give an opinion or "conclude" that Plaintiff had the capacity to perform his regular occupation. AR 1364. The conclusion that Plaintiff has the capacity to perform his regular occupation was made by Prudential's claim manager, Marisa Bourget, who interpreted Mr. Schwartzkopf's report. Id.**

56. Prudential terminated Plaintiff's claim, effective April 22, 2017, because Prudential determined Plaintiff had the capacity to perform his regular occupation within the outlined permanent restrictions and limitations and there was no support for psychological restrictions and limitations. (001319-1325.)

**Admitted that Prudential terminated his claim on this date but Plaintiff denies that this decision was reasonable. Not only is it clearly unreasonable to ask someone with hearing damage to return to a workplace with high noise levels, Prudential ignores the fact that his doctors have supported psychological issues related to his hearing damage, including inability to concentrate, poor sleep, anxiety, and depression.**

57. On October 18, 2017, Plaintiff submitted an appeal through counsel, arguing disability was supported by Dr. Bolter and that his condition had not improved; the new information from Oxy should not have altered Prudential's decision to reinstate benefits; and the chirping in his ear caused distraction and inattentiveness, which prevented his ability to work in the hazardous work environment. (001428-1433.) He submitted literature about sounds at certain decibel levels, plan documents, and an updated Attending Physician Behavioral Health Statement from Dr. Bolter dated April 5, 2017. (001428-1546.)

**Admitted that Plaintiff submitted the above referenced appeal. Caskey explained that nothing has changed with regards to his health since November 2016 when Prudential determined that he could not perform his previous occupation.  Caskey also pointed out that Prudential received a statement from Dr. Bolter noting that Caskey suffers from severe hearing damage and anxiety and depression related to chirping and tinnitus that is intractable. Caskey also submitted literature explaining that hearing damage at the decibel level that his employer reported at Caskey's workplace.  <u>AR 1428-1434</u>.**

58. Dr. Bolter's April 5, 2017 Attending Physician Behavioral Health Statement stated that he did *not* recommend Plaintiff to be off work, and, in response to the "return to work target date," he stated "N/A" and referenced follow up with Dr. Cole. (001544-1545.) He also did not support his Statement with updated records and, in response to his "rationale for recommending disability leave," he did not reference any mental health problems but simply stated: "appears to have problems with severe chirping sounds." (001544.)

**Admitted in part and denied in part.  Dr. Bolter provided a statement on April 5, 2017 in which he explained that he has problems with severe chirping sounds, anxiety and depression. It is true that Dr. Bolter initially did not tell Caskey to stop working. The decision to go on disability benefits was made by Caskey, as he was the one suffering from constant ringing, chirping sounds as well as the cognitive impairment caused by his hearing loss.  He also was aware that his job at the plant was causing his hearing loss. Although initially Dr. Bolter did not tell him that he had to stop working, he has been fully supportive of Caskey's claim throughout this process.**

59. In response to the appeal, Prudential obtained two additional independent medical reviews, which were performed by board-certified Otolaryngologist, Ross Clark, MD, and board-certified Neuropsychologist, Annette Swain, PhD. (001120-1148.)

**Admitted in part, denied in part. While Prudential received two additional medical reviews, these were reviewers were not truly "independent." Rather they are hired experts taking the side of the one paying them.**

60. Following review of all the documents in the record, Dr. Clark found -- consistent with Dr. Peters and Dr. Grossman -- that there was clinical evidence of hearing loss in both ears consistent with noise exposure loss and that Plaintiff has a permanent restriction that he should wear ear protection when exposed to significant noise levels (85 dB and above). (001140-1148.) He opined that Plaintiff's hearing loss was not severe enough on its own to disable Plaintiff and that his self-reported tinnitus was not disabling. (001141.)

**Admitted that Dr. Clark agreed that Plaintiff should wear hearing protection when exposed to loud noises. However, Dr. Clark ignored the fact that Caskey has explained that he cannot wear his hearing aids and earplugs simultaneously.  <u>AR 1426-1427</u>.  Significantly Dr. Ross states that "continued exposure to a noisy environment could wearing the hearing loss." <u>AR 1141</u>.**

**It is also important to note that Dr. Clark simply states that Caskey's hearing loss is not "severe enough on its own to disable the claimant" but he does not state that Caskey should be able to return to a job with loud noise.  Prudential did not ask Dr. Clark the important question of whether he thought Caskey was disabled from performing his previous job duty, which Prudential agrees involves exposure to loud noises.**

61. Following a separate review of all of the documents in the record, Dr. Swain concluded Plaintiff did not have any medically necessary restrictions from any psychological or cognitive standpoint from October 22, 2014 forward. (001135-1136.) She acknowledged Plaintiff has a chronic history of anxiety and depression, but noted there has never been an objective assessment of the severity of his emotional issues, nor is there evidence of symptoms, signs and/or behaviors warranting diagnosis of anxiety or depression. (001136.) The record was devoid of psychological testing score data, there was no proof of validity testing, and no actual psychological testing report. (*Id*.) In addition, Plaintiff's test

performances referenced by Dr. Bolter were wholly inconsistent with Plaintiff's job responsibilities, which he had been performing for many years. (001137.)

**Admitted that Dr. Swain provided an opinion, but Plaintiff denies that it was reasonable. Dr. Bolter provided psychiatric testing which demonstrated that Caskey was in the borderline mentally defective range academically ... clear evidence of auditory attention . . . tearful during multiple office visits . . . agitated and argumentative which would limits ability to interact consistently and appropriately as a supervisor of staff . . ." AR 1347-1348.**

62. Dr. Swain also explained that the July 2016 functional capacity form completed by Dr. Bolter, which identified Plaintiff's depression and anxiety as severe, was inconsistent with his own progress notes (001139) and that, despite a diagnosis of ADHD, there was zero evidence of testing or documented symptoms in the medical records to support the presence of a neurodevelopmental attentional disorder (00136).

**Denied. This is a classic example of cherry-picking. Dr. Bolter's notes in several places that he suffers from severe anxiety. For example, AR 310 (noting problems concentrating and severe anxiety; AR 312 (noting that he completed a battery of tests demonstrating "clear evidence of auditory attention, etc.")**

63. Finally, Dr. Swain also noted that she agreed with Dr. Jay's opinion and assessment. (001139.)

**Admitted that she agreed with Dr. Swain's opinion but denied that this was reasonable.**

64. Based on the reviews of Dr. Swain and Dr. Clark, Prudential upheld its determination denying Plaintiff's LTD benefits claim by letter dated November 30, 2017. (001334-1340.) Prudential determined that the medically necessary restriction and limitation would not prevent him from performing the duties of his regular occupation. (001339-1340.)

**Denied. Prudential upheld the termination of Caskey's benefits simply to avoid having to continue to pay such benefits. The opinions of Drs. Swain and Clark were essentially the same as the opinions of Drs. Grossman and Dr. Jay. Prudential previously agreed that Caskey was unable to return to work after reviewing the opinions of Drs. Jay and Grossman. Indeed, Prudential even stated that it would approve benefits throughout the**

regular occupation period.  Then, once it realized it would not be able to come up with alternative occupations that would meet the policy's earnings threshold during the any occupation period, it reached out to Caskey's employer fishing for new information to support the termination of benefits.

Respectfully submitted,

__s/s Reagan Toledano_____
Willeford & Toledano
Reagan L. Toledano (La. 29687)
201 St. Charles Avenue, Suite 4208
New Orleans, Louisiana 70170
(504) 582-1286; (f) (313)692-5927
rtoledano@willefordlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading has been served upon counsel of record by electronic filing using the CM/ECF system, which will send notification of this filing to all counsel of record on this October 31, 2019.

__/s/ Reagan Toledano_____