## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

STEVEN W. CASKEY

VERSUS

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA

CIVIL ACTION

NO.  18-694-JWD-RLB

RULING AND ORDER

This matter is before the Court on cross motions for summary judgment. (Docs. 37 & 38.) The parties have filed responses and replies. The Court held oral argument on the cross motions on June 25, 2020. (Doc. 67.) The Court has considered the facts in the administrative record, the arguments of the parties, and the applicable law. For the reasons expressed, the Court will grant *The Prudential Insurance Company of America's Motion for Summary Judgment*. (Doc. 37.)

RELEVANT FACTS

*a.  Factual Background*

Steven W. Caskey ("Plaintiff" or "Mr. Caskey") is 49 years old. (Doc. 20-1 at 229.) Mr. Caskey worked at Occidental Chemical Corporation ("Oxy") from 1996 to October 22, 2014. (*Id.* at 224.) His final job title was Shift Supervisor. (*Id.* at 229) Mr. Caskey filed this suit seeking judicial review of the decision by The Prudential Insurance Company of America ("Prudential") to terminate his long-term disability benefits. (Doc. 1.)

*b.  The Plan*

1.  General provisions in the Plan and Plan Documents

1

Oxy is the plan sponsor and plan administrator for the Occidental Petroleum Corporation Welfare Plan ("Plan") that provided, among other benefits, long term disability benefits to eligible participants in the Plan. (Doc. 20-1 at 1-21; 206.) The Plan is governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. (Doc. 20-1 at 206-211.)

The Plan consists of the Occidental Petroleum Corporation Welfare Plan ("Oxy Wrap"), the Oxy Long-Term Disability Summary Plan Description ("Oxy SPD"), the Oxy, Inc. Group Contract G-50262-TX, including applicable amendments ("Group Contract"), and the Long-Term Disability Booklet Certificate, including applicable rider, ("LTD Booklet Certificate"). (*See* Doc. 20-1 at 4 (Oxy Wrap at Section 1.2).) Section 1.2, Governing Documents of the Oxy Wrap states:

> (a) The following documents are hereby incorporated by reference into and shall be part of the document governing this Plan: (1) The Plan documents governing each Benefit Program. These documents shell provide, among other things, rules relating to the Coverage Options available under each such Benefit Program, the benefits available under each Coverage Option, and the rules governing eligibility for such benefits.

(Doc. 20-1 at 4.)

> Section 8.2(d) of the Oxy Wrap, Powers of the Plan Administrator, states:

> The Plan Administrator shall have the exclusive right to interpret the terms and provisions of the Plan and to resolve all questions arising thereunder, including without limitation the right to resolve and remedy ambiguities, inconsistencies, or omissions in the Plan. . . . All findings of fact, interpretations, determinations, and decisions of the Plan Administrator with respect to any matter or question arising under the Plan, shall be final, conclusive, and binding upon all persons having or claiming to have any interest in or right under the Plan, and shall be given the maximum possible deference allowed by law.

(Doc. 20-1 at 13.) The Oxy Wrap also states, "Additional named fiduciaries may be designated, and their respective functions delineated in the applicable summary plan descriptions." (*Id.*)

The Oxy SPD states, under the heading, The Claims Administrator, "Prudential, as the Claims Administrator, will decide your claims and appeals. Prudential has exclusive discretionary authority to interpret LTD Plan provisions as well as to determine facts and other information related to claims and appeals. Prudential's decisions are conclusive and binding." (Doc. 20-1 at 56.) The Supplement SPD attached to the LTD Booklet Certificate further states: "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contact, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." (*Id.* at 207.)

As designated, Prudential is the claims fiduciary and claims administrator for long term disability benefit claims brought pursuant to the terms and conditions of the Plan. (*Id.* at 56 and 207.) Prudential also insures long term disability benefits payable under the Plan. (*Id.* at 151 and 207.)

Section 10.9 of the Plan entitled Governing Law, states, "The Plan shall be construed, administered and governed in all respects under the applicable laws of the State of Delaware, except to the extent preempted by federal law, or governed by the applicable insurance law." (Doc. 20-1 at 19.) The Group Contract states, "The Group Contract is delivered in and is governed by the laws of the Governing Jurisdiction." (Doc. 20-1 at 151.) The Group Contract defines that the Governing Jurisdiction is the "State of Texas." (*Id.* at 152.) The Oxy SPD states, "If a conflict exists between a statement in this summary and the provisions of the Plan document or any applicable contract, the Plan document will govern. (Doc. 20-1 at 57.)

2.  The Plan's Definitions

The terms of the Plan provide the following definitions.

A.  Disability:

You are disabled when Prudential determines that: you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness or injury**; and you have a 20% or more loss in your **monthly earnings** due to that sickness or injury. After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury: • you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience; and • you are under the regular care of a doctor.

(Doc. 20-1 at 178 (emphasis in original).)

B. Regular Occupation:

[T]he occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

(*Id.*)

C. Material and Substantial Duties:

Duties that: are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified

(*Id.*)

1. Terms under the Plan

The Plan provides that:

We will stop sending you payments and your claim will end on the earliest of the following: 1. During the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to; after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to.

. . .

3. The date you are no longer disabled under the terms of the plan.

(*Id.* at 186.) If an individual is disabled and not working, the Plan details that Prudential will

determine that individual's payment by following:

this process to figure out your monthly payment: 1. If you are enrolled for Option 1, multiply your monthly earnings by 50%. But, if you are enrolled for Option 2, multiply your monthly earnings by 60%. 2. The maximum monthly benefit is $15,000. 3. Compare the answer in item 1 with the maximum monthly benefit. The

lesser of these two amounts is your gross disability payment. 4. Subtract from your gross disability payment any deductible sources of income.

(*Id.* at 180-181.) The Plan also provides with respect to deductible sources of income that:

Prudential will deduct from your gross disability payment the following deductible sources of income:

. . .

(3) The gross amount that you, your spouse and children receive or are entitled to receive as loss of time disability payments because of your disability under: (a) the United States Social Security Act; . . .

(*Id.* at 182-183.) Regarding overpayments, the Plan further states:

What Happens If Prudential Overpays Your Claim? Prudential has the right to recover any overpayments due to: • fraud; • any error Prudential makes in processing a claim; and • your receipt of deductible sources of income.  You must reimburse us in full. We will determine the method by which the repayment is to be made.

(*Id.* at 197-198.)

  c.  *Mr. Caskey's Claim*

  1.  The onset of Mr. Caskey's hearing loss, tinnitus, depression/anxiety

On September 20, 2012, Mr. Caskey saw otolaryngologist Stanley E. Peters, Jr., MD,

("Dr. Peters") with complaints of tinnitus, and sensorineural hearing loss. (Doc. 20-1 at 486.) Dr.

Peters recommended that he wear ear protection around any excessive noise and avoid all

tobacco products. (*Id.* at 490.) On October 14, 2014, saw Vicki Muhovich, PA at the

NeuroMedical Center Clinic who notes in the history of present illness:

44 year old male here for FU OV, last seen 9/30/14 Dr Acosta, with complaint of poor memory, poor sleep due to shift work, and episodes of confusion, anxiety, depression. History of tinnitus. He is very emotional and crying at OV. Reviewed MRI Brain which noted to be negative. EEG preliminary is within normal limits. [L]abs as available in system all noted to be normal.

He reports that this started around 2010 after he had shingles involving his left side of his face. He recovered from the face pain but now he has constant chirping in his hearing. He hears it equally out of both ears. He doesn't have any vertigo. He has some light headedness. but he does feel tired all the time. He does shift work and

has irregular hours of sleep. He has about two or three hours of sleep at night. He does 12 hour shifts from 4 pm to 4 am.

He will go to work and feels like a zombie. He will go through the motions and has to really concentrate to complete his tasks. He has had to lead meetings and lately he has noticed that he sometimes cannot complete his sentences. He has a headache every now and then he will take an Aleve about once every three to four weeks. [H]e does have a lot of cramps in his legs and sometimes that prevents him from sleeping. He does have a dog in the bed with him and his wife.

(*Id.* at 335.) On October 22, 2014, Mr. Caskey left his work at Oxy.

2. <u>Mr. Caskey's initial claim and termination.</u>

Mr. Caskey submitted a claim for long term disability benefits on March 26, 2015. (Doc. 20-1 at 229-231.)

Mr. Caskey's claim cited among other conditions, depression, anxiety, and attention deficit disorder as conditions leading to his disability. (*Id.* at 229-233.) Prudential received an Attending Physician Statement from Plaintiff's treating clinical neuropsychologist, John Bolter, PhD, dated March 24, 2015. (*Id.* at 234.) Dr. Bolter's March Attending Physician Statement noted a diagnosis of "depression/anxiety, ADHD, NOS," but stated "N/A" in response to his "date first unable to work," with a specific note that "I didn't disable him." (*Id.*) Dr. Bolter also checked "no" in response to the question "Did you advise your patient to stop working?" and, in response to the question "Please describe any restrictions or limitations and return-to-work plans," stated, "I have not restricted him from working." (*Id.*) Dr. Bolter provided an updated Attending Physician Statement on May 8, 2015, in which he checked "no" in response to the question, "Did you recommend this patient to be off work?" (*Id.* at 405.) Dr. Bolter also checked "no" in response to the question "Has a return to work date been discussed with the patient?" and stated the return to work target date was "not established but expect 6 months at least." (*Id.* at 406.)

6

On May 29, 2015, Susan Kelley, RN and Behavioral Health Consultant, reviewed Dr. Bolter's submissions and Plaintiff's medical records submitted in support of his claim. (Doc. 20-2 at 524.) In connection with her review, Nurse Kelley noted that Dr. Bolter's May 8, 2015 APS contradicted his May 4, 2015 medical records, which noted Plaintiff's "brighter presentation," that he reported he was "able to tolerate social situations," his "sleep [was] improving," he had "normal speech and "thoughts [were] normal," his "insight/judgment [was] intact, and "there [was] no acute depression, anxiety or agitation." (*Id.* at 525.) Thus, she opined that, although Plaintiff appeared to have been limited by an unstable mood from his date of disability through May 4, 2015, his prognosis was good, and that Prudential should consider an updated review of his claim in early June. (*Id.*)

On June 1, 2015, Prudential approved Mr. Caskey's long term disability claim, effective April 22, 2015 (Doc. 20-2 at 401-403.)

Prudential's internal notes states that it planned to review the claim again in June. (*Id.* at 525-526.) In connection with this continued review, on July 21, 2015, Prudential received an Activities of Daily Living Questionnaire and updated medical records from Mr. Caskey. (Doc. 20-1 at 412-420.) The Activities of Daily Living Questionnaire provided:

> Mr. Caskey states he was prevented from returning to work because he had the following medical conditions: anxiety, depression, lack of concentration, memory loss and tinnitus encephalopathy and organic parasomnia, ADHD.
>
> Responding to the question "What part of your job can you not do and why?", Mr. Caskey stated: "all of it, because of lack of concentration anxiety, depression and memory loss."
>
> Mr. Caskey explained that his sleeping was affected by his condition because, "Difficult falling asleep and staying asleep. Jerks in sleep."
>
> Mr. Caskey reported that he did not need help in dressing or grooming himself.
>
> He reported memory problems, indicating, "have trouble remembering – daily."

Mr. Caskey stated that he sometimes prepared his own meals, could drive and did
drive 2-3 days per week, but had problems forgetting where he was going and with
directions at times.

Mr. Caskey states he performs household chores like trash and lawn care and
shopped for food without assistance.

He also indicated he read the news/weather, watched TV, and participated in
activities including biking, bowling fishing, and hunting.

(*Id.*)

Nurse Kelly reviewed Plaintiff's Activities of Daily Living Questionnaire and his

updated medical records and noted in a claims note that Mr. Caskey's "current function remains

unclear." (Doc. 20-2 at 527.) Nurse Kelly recommended that Prudential consider a referral for a

psychiatric independent medical exam. (*Id.*) An independent medical exam was not scheduled

because Plaintiff informed Prudential that he was not comfortable attending an independent

medical exam and Prudential determined that was not unreasonable. (*Id.*) Prudential instead

decided to obtain updated behavioral health and Ear Nose Throat medical records and refer the

case to another clinician for review. (*Id.*)

Prudential received records from Stanley Peters, MD, an otolaryngologist who was

treating Plaintiff for tinnitus and ear chirping. (Doc. 20-1 at 350-364.) Dr. Peters' medical

records from June 12, 2015 detail that Mr. Caskey stated "he has been having ringing and

chirping and both hears. PT denies hearing loss. Pt states when depressed the ringing gets really

bad." (*Id.* at 353.) Dr. Peters' discussion notes detail "discussed the treatment options for hearing

loss. Also discussed the importance of hear protection in loud environments to prevent further

hearing loss. Discussed the causes and treatments of tinnitus. Also provided educational

literature. Also discussed the role of hearing loss in causing tinnitus and using hearing aids as a

treatment. Recommended low sodium and low caffeine diet." (*Id.* at 356.) Dr. Peters

recommended a follow up in September. (*Id.*)

Dr. Peters' medical records from September 2, 2015 detail the following problems: tinnitus, asymmetrical sensorineural hearing loss, allergic rhinitis, gastroesophageal reflux disease, dizziness and giddiness, difficulty speaking. (*Id.* at 350.) The records further note as to Mr. Caskey's physical exam:

> Constitutional: General Appearance: healthy-appearing, well-nourished, well groomed, and in no acute distress. Communication: normal communication w/o aids and voice quality.
>
> . . .
>
> Ears: Right External ear: normally formed and free of lesions. Left External ear: normally formed and free of lesions. Right External auditory canal: no discharge, obstruction or erythema and normal appearance. Left External auditory canal: no discharge, obstruction or erythema and normal appearance. Right Tympanic membrane: no significant abnormality noted, pearly grey, and landmarks clear. Left Tympanic membrane: no significant abnormality noted, pearly grey, and landmarks clear.

(Doc. 20-1 at 351.) Dr. Peters' discussion notes outline, "please schedule apt for hearing aid eval with tinnitus masker with and without." (*Id.*) Dr. Peters' medical records do not recommend Mr. Caskey stop working. (*Id.* at 350-364.)

Prudential received updated records from Dr. Bolter, from patient encounters on September 2, 2015 and December 2, 2015. On September 2, 2015, Dr. Bolter's history of present illness description notes:

> Steven Caskey returned to the clinic for problems related to anxiety and depression. He has been on a combination of medications to include clonazepam for sleep, Wellbutrin and Brintellix for depression, and Vyvanse and Adderall for attention problems. In general, he is beginning to show signs of benefits of the medication. He was seen today for follow-up care to include medication management and psychotherapy.

(Doc. 20-1 at 474.) Dr. Bolter also notes that Mr. Caskey's appearance is well developed and that he was well nourished, groomed and appropriately dressed. (*Id.* at 476.) Further that Mr. Caskey's speech, judgment, and thought processes were normal. (*Id.* at 476.) Dr. Bolter did

indicate that Mr. Caskey had some circumstantial associations when discussing topics of concern. (*Id.*) As to Mr. Caskey's mental status, Dr. Bolter details: "Orientation: oriented to time, place, and person", "Memory: intact for recent and remote events", "Atten[tion]/concentra[tion]: normal", "Language: no aphasia", "Fund of knowledge: able to name months, seasons, current president", and "Mood and affect: mild persistent anxiety and depression." (*Id.* at 477.)

As to Mr. Caskey's depression, Dr. Bolter indicates that his depression/anxiety "is under relatively good control with Brintellix and Wellbutrin . . . [h]e otherwise seems to be improving over time and he is looking to possibly get back into the work setting. I think that the fact that he is thinking along those matters indicates that he is beginning to feel better." (*Id.*) As to Mr. Caskey's attention deficit hyperactivity disorder, Dr. Bolter notes, "with regard to his ADD symptoms, he's done well with Adderall and Vyvanse. He wants to continue with the medication. . . He will return to me for follow up care in about three months." (*Id.*)

From Dr. Bolter's follow up appointment with Mr. Caskey on December 2, 2015, he notes in the history of present illness, "Steven Caskey returned lo clinic for routine follow-up and psychotherapy to address anxiety and depression. His activity level remains engaged. Overall, his mental health continues to improve with his current medications and cognitive-behavioral counseling under Dr. Cole's therapy." (*Id.* at 453.) Dr. Bolter notes that Mr. Caskey's mood and affect showed "no acute depression, anxiety, or agitation, but some chronic symptoms." (*Id.* at 457.) As. To Mr. Caskey's depression/anxiety, Dr. Bolter notes:

> [H]e continues to take medication . . .  He feels limited to medication is controlling his anxiety and depression. He wants to continue with the current regimen. I provided him with refills to cover the next 3 months. I also gave him some strategies for dealing with any residual symptoms of depression and him anxiety. Working on getting used to a hearing aid which is somewhat problematic at this point but I think it's important for him to do so. I encouraged him to follow-up with me in about 3 months. If any new problems arise he will contact me directly.

(*Id.*) As to Mr. Caskey's attention deficit and hyperactivity disorder, Dr. Bolter indicates that Mr.

Caskey would continue with his prescriptions and follow up at his next appointment. (*Id.*)

Prudential also received records from Brooke Cole, PhD, a clinical psychologist from

monthly patient encounters with Mr. Caskey including June 15, 2015, September 15, 2015,

October 15, 2015, and November 15, 2015.

Dr. Cole's notes on Mr. Caskey's history of present illness from the May 25, 2015

encounter state:

> Steven Caskey returns to clinic for routine follow-up and psychotherapy to address
> anxiety and depression. His presentation appears unchanged from that of previous
> session. However, he reports panic attacks occurring 2-3 times since our last
> meeting. After discussion it becomes clear that his mood has been lower and
> anxiety greater in direct relationship with self-directed changes to his medication .
> . . Behaviorally, he tries to keep a consistent routine, especially with dogs he cares
> for, cleaning kennels, feeding them, etc. He is frustrated by lack of sleep. His
> bedtime is typically between 9 and 10 p.m. He can fall asleep quickly, but his sleep
> is restless and fitful. He seems to be averaging anywhere from 8-12 hours in bed,
> despite feeling that he is not obtaining enough sleep. He has been able to go out
> into social situations and tolerate these. He attended his son's graduation but stayed
> near the door of the gymnasium. He has been in small groups of friends, tolerated
> well. He continues to have concerns that others are looking at and judging him. We
> discussed again how to understand and modulate his emotional reactions in various
> social settings.

(Doc. 20-1 at 516.)

In contrast, Dr. Cole's notes on Mr. Caskey's history of present illness from the

September 15, 2015 encounter state:

> His outward presentation today displays significant improvement. His mood is
> euthymic, and his affect is bright. He is able to smile and laugh. Negative cognitions
> are not as prominent. He reports that his activity level has improved as well.
> Overall, his mental health appears stable. His girlfriend was not able to come with
> him to today's session.
>
> He continues to have difficulty with tinnitus, chirping, and hearing loss. These are
> worse in settings with large groups of people or loud noises. He is able to maintain
> his anxiety at low levels if he is in one-on-one setting, but otherwise, he reports that
> the anxiety can return vary easily. He is being fitted for hearing aids. Supportive
> and cognitive-behavioral counseling conducted today with regard to the above.

(*Id.* at 470.) On October 15, 2015, Dr. Cole notes:

> His outward presentation today again displays significant improvement. His mood is euthymic, and his affect is bright. Negative cognitions are again with limited prominence. He appears hopeful for the future, especially with regard to receiving hearing aids to reduce tinnitus/chirping in his ears. His activity level remains engaged. Overall, his mental health continues to display markers of stability.

(*Id.* at 465.) On November 15, 2015, Dr. Cole notes:

> Steven Caskey returns to clinic for routine follow-up and psychotherapy to address anxiety and depression, last seen 4 weeks ago. His outward presentation today again displays significant improvement. His mood is euthymic, and his affect is bright. Negative cognitions are again with limited prominence. He appears hopeful for the future especially with regard to receiving hearing aids to reduce tinnitus/chirping in his ears. His activity level remains engaged. Overall, his mental health continues to display markers of stability. Supportive and cognitive-behavioral counseling conducted today with regard to the above.

(*Id.* at 460.)

Upon receiving the records from Dr. Peters, Dr. Bolter, and Dr. Cole for the September 2015-November 2015 time frame, Prudential engaged Gary McCollum, RN to conduct a review of the claim. (Doc. 20-2 at 529.) Nurse McCollum concluded:

> Medical: Main complaint is of tinnitus/chirping in both ears, reported to affect concentration. He has had tinnitus by history report for the last 3 years. Exam notes no external ear problems and treatment recommendation has been to obtain hearing aids with tinnitus features. He is recommended to wear ear protection in loud environments as course of treatment to prevent further hearing loss and LOV 11/02/15 indicated follow up is not until 05/2016. Based on this, there would be no limitations from a physical perspective. The claimant would be able to fully function from a physical perspective, and as recommended, should wear ear protection in loud environments, which would be a supported restriction. In addition, the claimant in 06/2015 indicated that the ringing and chirping in both ears is worse when he gets depressed. See psychiatric analysis below.

> Psychiatric: In 09/2015 the claimant's prescribing psychologist, Dr. Bolter, indicated that he was beginning to show signs of benefit from medications. MSE noted normal thought processes and speech, intact memory, and normal attention/concentration. Impression was of relative (sic) good control with Brintellix and Wellbutrin, Klonopin at night for sleep and reported EE? Looking to possibly get back into the work setting? Follow up therapy visits with Dr. Cole on 09/15, 10/15, and 11/16 noted continued stable improvement with euthymic mood, improvement in activity level, stating mental health appears stable. With frequency

of therapy visits at 1 time per month up to 11/16, and then decrease in frequency recommended at 1-2 months for follow-up, as well as medications being stable since 09/2015, and expressing interest in return to work in 09/2015, the claimant would no longer have supported behavioral health restrictions or limitations as of 11/16/15, when he successfully showed stability of mood for a period of 2 months (09/02/15-11/16/15).

(*Id.*)

Based on Nurse McCollum's review, Prudential terminated Plaintiff's claim as of January 18, 2016. (Doc. 20-2 at 431.) The termination letter indicates that Prudential made this decision based on the patient encounters through November 15, 2015. (*Id.* at 432.) The termination letter states, "Based on the review of the file, we find that you no longer have restrictions and limitations that prevent you from returning to work." (*Id.* at 432.)

3.  Mr. Caskey's first appeal and Prudential's decision to uphold its decision

On January 27, 2016, Plaintiff filed an appeal stating in his letter, "Per the conversation we had this morning, I would like to appeal the decision to terminate my LTD. I feel that I am still unable to perform my duties as a shift supervisor." (*Id.* at 65.) Following the appeal, Prudential requested and received updated records from Plaintiff's treating physicians. (*Id.* at 531.) Prudential requested independent medical file reviews by a board-certified otolaryngologist and a board-certified neuropsychologist, from a third-party company, University Disability Consortium. (*Id.* at 443.)

Dr. Peters' updated records from a patient encounter on January 8, 2016 state,

Reported hearing aids helping with hearing loss and helping with the tinnitus, but still high anxiety of tinnitus especially at night. Counseled highly on tinnitus, hearing loss, habituation of tinnitus, and hearing aid use. Made slight adjustments to aids: Program 1 all around plus masker, Program 2 all around softer and masker softer, Program 3 all around and masker louder, and Program 4 softer for noise. Follow-up in 1 week with extended trial slightly.

(Doc. 20-1 at 428.) Dr. Peters' updated records from February 2, 2016, state that Mr. Caskey appeared healthy, well nourished, well groomed, and had "normal communication [without] aids

13

and voice quality." Dr. Peters' notes indicate that Mr. Caskey was "not sleeping, chirping to bilateral ears, describes a 'shock wave feeling in my heard' when he wakes up." (*Id.* at 425.) The records further detail that during the visit, Dr Peters "discussed the causes and treatments of vertigo. Recommend vestibular and/or VOR exercises as instructed. Recommend low sodium and low caffeine diet. Also recommend to avoid using vestibular suppressing medications, unless absolutely necessary." (*Id.* at 426.)

Dr. Bolter, Mr. Caskey's prescribing neuropsychologist, provided updated medical records from a February 2, 2016 visit. The records detail:

> Steven Caskey is a 45-year-old male who has ongoing problems with severe tinnitus after being injured in a plant. Unfortunately, he has lost his benefits or healthcare and there may be litigation issue arising out of this. He will return to clinic because he is frustrated and uncertain as to what to do. He had been doing a bit better but has never really been able to get rid of the tinnitus in his ears causing and severe problems, particularly at night when he is trying to sleep. He was seen today for medication management and psychotherapy.

(Doc. 20-1 at 436.) Dr. Bolter further notes:

> He struggles with a problem as associated with tinnitus. He finds that to be significantly problematic for him. I provided him with supportive psychotherapy given some strategies for dealing with his issues. I also encouraged him to get some defense (sic) due to the fact. He is feeling as if he is tossed aside from his plan. He would love to go back to work but he can't do so given the fact that such problems with his tinnitus.

(*Id.* at 440.) Finally, in regard to Mr. Caskey's depression/anxiety, Dr. Bolter explains:

> He is experiencing problems with depression. He is currently taking a number of medications in an effort to control those problems, such as Brintellix. Because he is having so many difficulty (sic) with sleeping, I recommended that we try some Seroquel. He may need to be on a much higher dose than usual but for now I'm putting him on Seroquel at 100 mg dally If that fails, I'll consider pushing up to 200. I also discussed other issues with regard to his overall functioning, which I think he has deteriorated due to his stress. He will return to me for follow-up care in about a month.

(*Id.*)

Dr. Cole, who Mr. Caskey saw for psychotherapy, provided updated records from office

visits on December 15, 2015 and January 20, 2016. (Doc. 20-1 at 443-452.) Dr. Cole's records

from December 16, 2015 note:

> Steven Caskey returns to clinic for routine follow-up and psychotherapy to address anxiety and depression, last seen 4 weeks ago. His outward presentation today is stable. His mood is euthymic, affect is broad and appropriate. He received hearing aids two weeks ago with Dr. Peters' office. He had some initial difficulty adjusting to these, aid is still trying to adjust settings in different environments (home. while driving, in office buildings) to become acclimated to the devices. His activity level remains engaged, although he admits that he is limiting himself from environments in which numerous people may be present, such as a restaurant or large store, because he has some worry about how he will cope with these settings. We discussed coping strategies for these concerns. Supportive counseling and problem solving conducted today.

(*Id.* at 448.) Dr. Cole's records for Mr. Caskey's January 20, 2016 visit detail:

> Steven Caskey returns to clinic for routine follow-up and psychotherapy to address anxiety and depression, last seen 4 weeks ago. His outward presentation today is stable. His mood is euthymic, affect is broad and appropriate. He has had same difficulty adjusting to the hearing aids, complicated by upper respiratory infection that prevented him from wearing them. Now that he has returned to regular wear, his attention span is reduced as he feels he is paying too close attention to the sound. He admits that he has avoided using the aids in various settlings. Although his overall activity level remains engaged, he admits that he is limiting himself from environments in which numerous people may be present, such as a restaurant or large store, because he has some worry about how he will cope with these settings. He plans to follow-up with Dr. Peters' office over the coming weeks. We discussed coping strategies for the above concerns. Supportive counseling and problem solving conducted today.

(Doc. 20-1 at 443.)

On April 6, 2016, board-certified otolaryngologist Ronald M. Grossman, MD, completed

his review. (Doc. 20-2 at 131.) Dr. Grossman outlined:

> The claimant only has a well substantiated diagnosis of bilateral mild to moderate sensorineural hearing loss that is worse in the left ear. His discrimination scores are normal never being below 96% in even his worse hearing ear (left). He has concomitant tinnitus which is a credible complaint, albeit one that cannot be quantified. He is at best a borderline candidate for amplification and the type of aid recommended by his attending otolaryngologist is an appropriate recommendation. This type of aid also has tinnitus masking built into it and should not only help his

> hearing, but also suppress his tinnitus. The claimant's history points to noise
> exposure as a case for his hearing lost. . . As a result his otolaryngologist and
> audiologist have recommended that he wear noise protection while at working or
> while using loud machinery such as lawn mowers or other power equipment. From
> an otolaryngology perspective, this is the only restriction and there are no findings
> within the reviewer's expertise that would prevent the claimant from returning to
> work. Only his tinnitus has any potential to impact his psychological problems and
> the co-morbid reviewer, Dr. Jay, does not feel that they currently prevent his return
> to work.

(Doc. 20-2 at 131-132.) Dr. Grossman did not impose any restrictions or limitations on Mr.

Caskey returning to work but recommended that he indefinitely wear ear protection around

excessive noise. (*Id.* at 132.)

On April 6, 2016, board-certified neuropsychologist, Milton Jay, Ed.D, also completed

his review of Plaintiff's medical records. (*Id.* at 134-140.) Dr. Jay concluded that "as of January

19, 2016 forward, [Mr. Caskey] had mild, chronic residual symptoms of depression and anxiety.

Regarding cognitive symptoms, available cognitive testing reported was not clearly sufficient in

detail or quality to support any cognitive disorder or ADHD or borderline intellect." (*Id.* at 138.)

Based on these independent medical reviewer conclusions, Prudential upheld its decision

to terminate Mr. Caskey's long term disability benefits claim because "the information contained

in your file does not support impairment that would prevent you from performing the material

and substantial duties of your regular occupation." (Doc. 20-2 at 450.)

4. Mr. Caskey's second appeal and Prudential's decision to reinstate benefits

Mr. Caskey submitted a second voluntary appeal on July 15, 2016. (Doc. 20-1 at 563-

566.) Enclosed with the appeal were: (1) Affidavit/Declaration of Steven Caskey; (2) Plan

documents from Oxy; (3) letter from Mr. Caskey's girlfriend; (4) a Medical Residual Functional

Capacity Assessment from Dr. Bolter; (5) University Disability Consortium conflict of interest

evidence; and (6) information about working at a chemical plant.

Mr. Caskey's declaration sets out his job requirements and the onset of his hearing issues,

stating;

> My job as a shift supervisor required that I supervise the tire brigade and make important environmental calculations. When we had leaks and spills I had to go on site to calculate how much material spilled. I had to provide shift safety meetings. I was the only guy out there on nights and weekends. There was constant loud noise on the job, such as loud steam leaks in the units. I wore earplugs, but the leaks were so loud that ear plugs did not provide enough protection. The plant I worked in had high pressure steam emit from pipes that emits a loud sound that hurts my ears.

(*Id.* at 573.) Mr. Caskey goes onto declare, "It became more and more difficult to get a good

night's sleep because I was kept up by the ringing and chirping in my cars. I would go to work

the next morning in a zombie-like trance." (*Id.*)  In addition, Mr. Caskey provides,

>  My anxiety and depression is chronic and severe. I believe it is primarily related to the ringing in my ears. I have to take out my hearing aids at night because they fall out of my ears when I sleep. Without the hearing aids I hear the chirping and ringing. While wearing my hearing aids, I do not hear the ringing and chirping; instead I hear an ocean-like sound. This sound is less distracting than the ringing and chirping, however the ocean-like sound is still distracting.
>
> . . .  I cannot wear hearing aids and ear plugs at the same time while working at the plant. The hearing aid rests in the inside of my ear where the earplugs would have to be placed. Even if I could wear ear plugs while working on the plant, I am not able to perform my job due to fatigue, inability to concentrate, and poor short term memory.

(*Id.* at 573.) Ms. Roxanne Trepagnier, Plaintiff's girlfriend of 8 years, wrote in her letter:

> He first started complaining about his hearing, he would say that he had a chirping and ringing noise. After a while of that he told me that it was getting worse and it was affecting his sleep. There are many nights that he is up and down all night. Overtime he started with anxiety, depression, memory loss and irritability which is probably from lack of sleep from the chirping and ringing. He has problems with his concentration. All this started to affect his job. He never sleeps through the night, without waking up several times. Sometimes he can't go back to sleep. There are days that he can't get out of the house because of this. He is always tired and he never really feels rested. On the nights that he doesn't sleep well I find that his depression, anxiety and mental focus is worse. He started wearing hearing aids that do not seem to be helping with this. Whenever he has doctor appointments or has to take care of anything I have to make sure I write him a list and sometimes he still can't follow through.

(Doc. 20-1 at 568.)

Dr. Bolter, Plaintiff's treating neuropsychologist, filled out a Medical Residual

Functional Capacity Assessment as of July 14, 2016, that detailed that Mr. Caskey's prognosis

was poor and that Mr. Caskey continued to have problems with anxiety and depression. (*Id.* at

569.) Dr. Bolter indicated he would continue to see Mr. Caskey on a monthly basis. (*Id.*)  Dr.

Bolter reported that Mr. Caskey's ability to do regular and sustained active was marked, meaning

"the ability to function in this area is seriously limited." (*Id.* at 570.) Dr. Bolter indicated that Mr.

Caskey's understanding and memory was moderate to marked, sustained concentration and

persistence was moderate to marked, social interaction was mild to marked, and adaptation was

moderate to marked. (*Id.* at 570-572.) Dr. Bolter also concluded that Mr. Caskey could not work

because "he has serious problems related to abnormal hearing with significant problems." (*Id.* at

572.) Dr. Bolter advised that he did not believe Mr. Caskey was a malingerer. (*Id.* at 569.)

The literature regarding chemical plants included news articles about the safety concerns

that employees face, what their daily lives are like and how they are impacted by stress. (*Id.* at

575-592.) Mr. Caskey's attorney also argued that a review of case law found that the

independent medical reviewers were not independent because in all reported cases, they provided

opinions supporting the denial of benefits. (*Id.* at 565.)

Prudential engaged Dr. Jay to complete an addendum medical file review, which

concluded that the new medical records did not alter his prior assessment and there was no basis

for restrictions that would affect Plaintiff's functional capacity due to ADHD or

depression/anxiety. (Doc. 20-2 at 233.) Dr. Jay explained that his assessment did not change

because,

> Review of more-recent records from Dr. Bolter did not provide clinical examination
> evidence of ADHD or depression. His reports included diagnostic impressions,

assertion of continuing depression/anxiety symptoms, and report of mild improvement of symptoms. But no results from psychological testing, detailed clinical examination, or even mental status exam testing were reported. Thus, only clinical conclusions were reported, not clinical examination data. Although one of Dr. Bolter's responses on the August 9, 2016 questionnaire indicated "severe depression and anxiety," that greater indication of severity did not seem consistent with the "mild improvement" report on August 2, 2016. That "severe" rating also did not seem consistent with the July 14, 2016 GAF rating of 60, which was at the boundary' of the mild and moderate ranges of overall status. It was further not consistent with reports from both Dr. Bolter and Dr. Cole from September 2015 through February 2016 of relatively mild depressive/anxious symptoms of a chronic nature without any significant acute exacerbations.

(*Id.* at 234.)

Prudential engaged Dr. Grossman to complete an addendum medical file review, which concluded that the additional documentation did not alter his prior assessment. (*Id.* at 230.) Dr. Grossman's analysis on appeal states:

The claimant has no objective evidence of a significantly handicapping hearing loss. He does have a mild high frequency bilateral and asymmetrical sensory neural hearing loss and a history of tinnitus. The reviewer does feel that this loss is due to noise exposure. The claimant feels that his earplugs have not protected him sufficiently. Adding external muff type hearing protection would add another 15 dB of protection for a total of 45 dB of noise protection. There is no documentation of the sound levels in his prior work place and this would be necessary to know regarding the appropriate level of protection for the claimant. Even if the sound level were 105 dB, this type of protection would lower the claimant's exposure to the levels of normal conversation (60 dB).

(Doc. 20-2 at 228.) Dr. Grossman further explains, "Properly fitted earplugs or muffs reduce noise 15 to 30 dB. The better earplugs and muffs are approximately equal in sound reduction, although. earplugs are better for low frequency noise and earmuffs for high frequency noise. Simultaneous use of earplugs and muffs usually adds 10 to 15 dB more protection than either used alone. Combined use should be considered when noise exceeds 105 dB." (*Id.* at 229.) Dr. Grossman expanded his restrictions/limitations to include indefinite limitations of: "Combined ear protection utilizing both ear plugs and external muffs in work areas where sound levels

approach or exceed 105 dB; Removal for 15 minutes every two hours from areas of 105 dB or greater sound levels." (*Id.* at 230.)

Given these more specific restrictions and limitations, Prudential requested a regular occupation review from its vocational specialist Gregg Schwartzkopf. (Doc. 20-2 at 536.) Mr. Schwartzkopf noted that Plaintiff's regular occupation is most similar to production supervisor, which requires frequent talking and hearing; it has noise levels that are classified as loud; that it would be difficult to leave the factory floor at specific intervals in the work day; and Plaintiff's hearing protection requirements would interfere with the communication required by his regular occupation. (*Id.* at 537.) Following this vocational review, Prudential reinstated Plaintiff's long-term disability benefits in a letter dated November 17, 2016, effective January 19, 2016. (*Id.* at 466.) Prudential's letter reinstating benefits explained:

> we have determined that Mr. Caskey's regular occupation is consistent with the occupation of Production Supervisor. This occupation requires talking and hearing frequently and is performed in an environment with loud noise levels. The level of hearing protection Mr. Caskey requires would interfere with his ability to communicate and remove himself from loud noise areas at specific intervals throughout the work day would be difficult.

(*Id.* at 469)

5. <u>Prudential terminated the reinstated benefits</u>

Five months after reinstating benefits, Plaintiff's own occupation long term disability benefits were set to expire on April 22, 2017, when the "any occupation period" would begin. (Doc. 20-2 at 539.) On April 5, 2017, Plaintiff's file was referred to the vocational forensic team, who on April 13, 2017 deferred conducting an employability analysis because of remaining questions regarding the specifics of Mr. Caskey's work environment at Oxy. (*Id.* at 571.) On April 17, 2017, the claims manager sent an email to Oxy asking specific questions regarding the

work environment and shift supervisors. (*Id.* at 572.) On April 20, 2017, Oxy responded to

Prudential's questions. (*Id.* at 540.) Specifically, Oxy explained:

> Our plant does not have a "production floor". We are a chemical process facility
> with our production occurring in an outside environment. The decibel level can
> range from 80 decibels to 100 decibels. Hearing protection is required in "high
> noise areas", areas of 85 decibels or greater. There are 2 small process areas where
> the decibel level can reach 106dBA. Areas above 100 decibels are considered
> double hearing protection areas and are indicated with signs in the field and listed
> on a sound level survey map. Double hearing protection is when an individual
> wears ear plugs and ear muffs at the same time. However our shift supervisors do
> not work routinely in these areas. Most of their work time is spent in office/control
> room type environments.

(Doc. 20-2 at 68.) Oxy further detailed,

> Employee[s] can communicate in the process areas verbally. The range of sound
> levels in the process areas are not louder than the human voice. In addition radios
> are available to operations and maintence personnel through the plant with separate
> radio channels for different operations. The shift supervisors radio is keyed into the
> emergency channel at all times. In addition the shift supervisor role shares a cell
> phone for any emergency events or communication with plant management that
> may be required.

(*Id.*)

Prudential had Gregg Schwartzkopf perform an addendum regular occupation review. On

April 20, 2017, Mr. Schwartzkopf concluded that Mr. Caskey's work environment at Oxy

complied with the restrictions and limitations outlined by Dr. Grossman. (*Id.* at 540-541.) On

April 21, 2017, the claims manager, Ms. Marissa Bourget, concluded that "as [Mr. Caskey] could

perform his regular occupation based on the updated [vocational review] and [permanent

restrictions/limitations] in file and there is no support for [mental health] condition, reasonable to

pay [Mr. Caskey] through 4/21/2017 and [terminate] 4/22/2017." (*Id.* at 541.)

On October 18, 2017, Plaintiff submitted an appeal through counsel. (Doc. 20-2 at 605.)

Plaintiff provided: a declaration of Mr. Caskey, literature providing examples of certain sounds,

at certain decibel levels, additional medical records, documentation regarding Mr. Caskey's

occupation, literature explaining correlation with noise/chemicals and hearing damage; and documents previously provided to Prudential. (*Id.*) The appeal argues that Mr. Caskey's disability was supported by Dr. Bolter and that his condition had not improved; the new information from Oxy should not have altered Prudential's decision to reinstate benefits; and the chirping in his ear caused distraction and inattentiveness, which prevented his ability to work in the hazardous work environment. (*Id.* at 606.)

Mr. Caskey also submitted an updated Attending Physician Behavioral Health Statement from Dr. Bolter dated April 5, 2017. (*Id.* at 721.) In response to the question, "Did you recommend this patient to be off work?", Dr. Bolter responded "No". (*Id.* at 721.) Dr. Bolter indicates that Mr. Caskey "appears to have problem with severe chirping sounds" and provides that "he expresses problems with depression/anxiety. Sounds related to chirping that cause problems with (sic) interacting with others." (*Id.*)

Prudential engaged two additional independent medical reviews, which were performed by board-certified Otolaryngologist, Ross Clark, MD, and board-certified Neuropsychologist, Annette Swain, PhD. (*Id.* at 297.) Dr. Clark found:

> The claimant should wear ear protection when exposed to significant noise levels. The claimant has clinical evidence of hearing loss bilaterally consistent with noise exposure loss. Continued exposure to a noisy environment could worsen the hearing loss. . . This is a permanent restriction.

(*Id.* at 318.) Dr. Clark further reported, "The hearing loss is of the type that may cause tinnitus or a high pitched noise. The degree of the tinnitus is subjective (self-reported) and cannot be determined with the standard audiogram since the symptom is subjective. There appears to be some psychological issues which could reduce his ability to cope with the tinnitus. The chirping sounds would be an unusual description of the tinnitus." (*Id.* at 319.) Dr. Clark further opines, that "His hearing loss while being significant is not severe enough on its own to disable the

claimant. As noted above the tinnitus, while being present would not be disabling. The psychological aspects of the case including concentration difficulties are not in this reviewer's purview. If appropriate ear protection is used the claimant should not be precluded from his job duties as a production manager." (*Id.*)

Dr. Swain similarly concluded that Mr. Caskey did not have any medically necessary restrictions from any psychological or cognitive standpoint from October 22, 2104 forward. (*Id.* at 312.) Dr. Swain notes:

> The claimant has a chronic history of anxiety and depression that have been repeatedly documented in the medical records as "some chronic symptoms." There has never been any objective assessment of the severity of his emotional issues. There has never been presented a listing of symptoms, signs, and behaviors warranting diagnosis of anxiety or depression. Apparently psych testing was completed in late 2014 or early 2015, but no report was ever produced or at least made available as part of the claimant's record. There was never even provided a test score data sheet. There was reference made to the testing by Dr. Bolter, but no actual scores were provided and no discussion was made regarding the performance validity of the evaluation. The claimant reportedly made complaints of attentional issues and apparently claimed that he was previously diagnosed with ADHD, but there is no documentation of symptoms to support the presence of a neurodevelopmental attentional disorder. This does not dismiss that the claimant may have been experiencing a degree of distress, but the records fail to provide evidence to support psychiatric diagnoses of sufficient severity to warrant restrictions or limitations in the claimant's ability to function. The claimant has been under care for psychotropic medications and psychotherapy, but his frequency of visits for medications generally has only been once per month to three months with psychotherapy, he was never seen more frequently than once every two weeks. There was never any mention of the need for more frequent visits or any need for more intensive care. This would support a mild severity to any emotional complaints.

(*Id.* at 313.) Dr. Swain expressed consternation that "[t]he severity of his reported impairments are not consistent with the documentation by his treating providers, which have consistently documented his emotional problems as chronic and not acute and as mild in severity." (*Id.* at 314.) Further, that the functionality evaluation completed in July 2016, was "inconsistent with

consultation notes." (*Id.*) Ultimately, the consensus recommendation from Dr. Clark and Dr. Swain states,

> [T]he claimant does suffer from hearing loss that is likely noise-induced, in addition to tinnitus and depression and anxiety that is in part a reaction to the stress associated with the tinnitus. His hearing issues have been stable since 2015, and his emotional issues have never been of sufficient severity that his treating providers have ever recommended treatment more frequent than twice per month, and typically only once per month. There has never been provided documentation of objective standardized assessment of cognitive or psychiatric status. We agree that there is insufficient evidence to support the presence of functional impairments requiring any restrictions or limitations in the claimant's ability to function. Dr. Clark does support, however, the repeated recommendations that the claimant wear ear protection especially in loud environments. Please see Dr. Clarke's report for details.

(*Id.* at 322.)

Prudential completed its review of Mr. Caskey's disability benefit appeal. In a letter dated November 30, 2017, Prudential detailed that it "determined []our decision was appropriate and have upheld our decision to terminate his claim for [long term disability] benefits effective April 22, 2017." (*Id.* at 511; *see id.* at 511-517.)

### d. *Procedural history*

Plaintiff filed his *Complaint* pursuant to 29 U.S.C. § 1132(a)(1)(B) against Prudential on June 18, 2018. (Doc. 1.) The Administrative Record was filed on October 12, 2018. (Doc. 20.) Prudential filed its *First Amended Answer and Counterclaim* on July 10, 2019. (Doc. 29.) The cross motions for summary judgment were filed on October 3, 2019. (Doc. 37 and 38.)

## RELEVANT STANDARD

"Standard summary judgment rules control in ERISA cases." *Ramirez v. United of Omaha Life Ins. Co.*, 872 F.3d 721, 725 (5th Cir. 2017). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his

burden of showing that there is no genuine issue of fact, "its opponent must do more than simply

show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party

must come forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89

L. Ed. 2d 538 (1986) (citations omitted). The non-mover's burden is not satisfied by "conclusory

allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid

Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotation marks omitted).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

PARTIES' ARGUMENTS

a. *Defendant's Motion for Summary Judgment*

    1. Defendant's arguments in support

        A. *Prudential's decision should be reviewed for abuse of discretion*

        Prudential argues that the Disability Plan "explicitly and unambiguously grants

Prudential discretion to interpret the [Disability] Plan and to decide claims." (Doc. 37-1 at 3.)

Specifically, Prudential contends that as the plan administrator, it has the exclusive right to

interpret the terms and provisions of the Disability Plan and may assign its rights to designated

fiduciaries named in the summary plan descriptions. (*Id.*) Therefore, Prudential concludes that an

abuse of discretion standard applies in this case. (*Id.*)

        The Oxy Summary Plan Description ("Oxy SPD") confirms that Oxy designated

Prudential as the claim's administrator and that an abuse of discretion standard applies. (Doc. 37-

1 at 4.) The Oxy SPD informs plan participants that Prudential has complete authority to: (1)

review all denied claims for benefits; (2) determine eligibility for benefits; (3) determine whether

and to what extent covered participants are eligible for benefits; (4) construe disputed terms in

25

the Disability Plan. (*Id.*) Similarly, the Supplemental Summary Plan Description details, "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contact, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." (*Id.*) Considering the documents in total, Prudential concludes that an abuse of discretion standard is appropriate. (*Id.*)

Prudential also argues that its structural conflict of interest (i.e. that it pays benefits and decides claims) should not alter the standard of review. (*Id.* at 16.) Prudential asserts that outside of the structural conflict of interest, there is no evidence that Prudential has a further conflict given the time, expense, and its careful attention to the details of Plaintiff's claim. (Doc. 37-1 at 17.) The multiple independent medical reviews on appeal, and rigorous investigation contradicts the assertion of bias. Therefore, Prudential concludes that the Court should give the structural conflict of interest no weight. (*Id.*)

B. *Prudential's decision was not an abuse of discretion*

Applying the abuse of discretion standard, Prudential outlines that the sole question before the Court is "whether Prudential abused its discretion that Plaintiff was not entitled to continued benefits under the [Disability] Plan, as he failed to satisfy the definition of disability." (Doc. 37-1 at 5.) Prudential states that, as applied in this case, the Disability Plan defines disability as, "you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; you are under the regular care of a doctor; and you have a 20% or more loss of your indexed monthly earnings due to that sickness or injury." (Doc. 37-1 at 5.) Prudential argues Plaintiff did not meet the definition of disability because Plaintiff did not establish that his physical or mental conditions prevented him from performing his regular occupation as a shift supervisor at Oxy. (*Id.*)

26

Prudential first argues that in terminating Plaintiff's benefits, it reasonably relied on

Plaintiff's treating physician's records, an internal medical review, four external medical

reviews, and a vocational review. (*Id.*) Looking to the medical evidence provided by Plaintiff,

Prudential contends that neither Plaintiff's mental nor physical health prevented him from

working in his own occupation. (*Id.*)

Plaintiff's treating providers for his anxiety and depression are his clinical

neuropsychologist, John Bolter, PhD, and clinical psychologist, Brooke Cole, PhD. In reference

to whether Plaintiff's anxiety and depression are disabling, Prudential argues Dr. Bolter's and

Dr. Cole's records present the following timeline:

> March 24, 2015: Dr. Bolter's Attending Physician Statement ("APS") stated: "I
> didn't disable him" and "I have not restricted him from working." May 8, 2015: Dr.
> Bolter's APS answered "no" to the question of "Did you recommend this patient to
> be off work?." September 2, 2015: Dr. Bolter's medical record stated: "he is
> beginning to show signs of benefits of medication." September 15, 2015: Dr. Cole's
> medical record stated: "His outward presentation today displays significant
> improvement. . . . Overall, his mental health appears stable." October 15, 2015: Dr.
> Cole's medical record stated: "His outward presentation today again displays
> significant improvement . . . Overall, his mental health continues to display markers
> of stability." November 15, 2015: Dr. Cole's medical record stated: "His outward
> presentation today again displays significant improvement. . . . Overall, his mental
> health continues to display markers of stability." December 2, 2015: Dr. Bolter's
> medical record stated: "His activity level remains engaged. Overall, his mental
> health continues to improve with his current medications and cognitive-behavioral
> counseling under Dr. Cole's therapy." December 16, 2015: Dr. Cole's medical
> record stated: "His outward presentation today is stable. His mood is euthymic,
> affect is broad and appropriate." January 20, 2016: Dr. Cole's medical record
> stated: "His outward presentation today is stable. His mood is euthymic, affect is
> broad and appropriate." February 2, 2016: Dr. Bolter's medical record stated: "He
> had been doing a bit better but has never really been able to get rid of the tinnitus .
> . . . He was seen today for medication management and psychotherapy." July 14,
> 2016: Dr. Bolter's Medical Residual Functional Capacity Assessment did not
> mention anxiety and depression in response to the question "Do you believe that
> your patient can work on a regular and sustained basis in light of his or her mental
> impairment?" but rather stated, "[h]e has serious problems related to abnormal
> hearing with significant problems." April 5, 2017: Dr. Bolter's APS stated that he
> did not recommend Plaintiff to be off of work and, in response to the "return to
> work target date," he stated "N/A" and referenced following up with Dr. Cole. Also,

as to his "rationale for recommending disability leave," he did not reference any mental health problems but simply stated: "appears to have problems with severe chirping sounds." (*Id.*)

(Doc. 37-1 at 6-7 (internal citations omitted).) Taking these records into consideration, Defendant argues there is no evidence that Plaintiff is disabled due to his anxiety or depression. (*Id.* at 7.) As to Plaintiff's physical conditions—tinnitus, hearing loss, and chirping in his ears— Prudential argues that Plaintiff's treating otolaryngologist, Stanley Peters, MD, did not recommend Plaintiff stop working or impose any restrictions from working. (*Id.* at 7-8.) Therefore, based on a review of the treating providers' records, Prudential argues Plaintiff does not have any restrictions or limitations based on his claims that he was disabled due to tinnitus, hearing loss, or chirping in his ears. (*Id.* at 8.)

Prudential's internal review was conducted by Registered Nurse McCollum, who addressed Plaintiff's medical concerns before noting that the record did not support the need for restrictions or limitations. (Doc. 37-1 at 9.) Nurse McCollum's conclusions rested on the facts that Plaintiff had suffered from tinnitus/chirping in his ears for three years without issue, his treating otolaryngologist did not recommend Plaintiff stop working, and his mental health records showed improvement overall. (*Id.*)

Prudential asserts that during Plaintiff's first appeal, Prudential obtained updated records from Plaintiff's medical providers and had two independent board-certified physicians conduct file reviews of the records. (*Id.*) Ronald M. Grossman, MD, a board-certified otolaryngologist, performed an independent medical file review regarding Plaintiff's hearing loss and tinnitus, which concluded that there were no restrictions to prevent Plaintiff from returning to work as of January 19, 2016. (*Id.* at 9-10.) Milton Jay, Ed.D., a board-certified neuropsychologist, performed an independent medical file review regarding Plaintiff's mental health claims, which

concluded that Plaintiff's mental health symptoms were not severe enough to require any work restrictions.  (*Id.* at 10.)

As to Plaintiff's second appeal, Prudential submitted additional documentation from Plaintiff to both Dr. Grossman and Dr. Jay for reconsideration. Dr. Grossman revised his recommendation to include that Plaintiff (1) required noise protection including ear plugs and external muffs in areas with sound approaching and exceeding 105dB; and (2) needed 15 minutes sound rest periods every two hours at the same sound level. (*Id.* at 11.) Prudential's vocational reviewer concluded those restrictions may interfere with Plaintiff's occupation's communication requirements, Prudential reinstated Plaintiff's disability benefits. (*Id.*)

Following this reinstatement, Prudential subsequently terminated Plaintiff's benefits and Plaintiff submitted a third appeal. Prudential engaged two new independent medical file reviews by board certified otolaryngologist and neuropsychologist. Prudential argues that the independent medical file reviews also supported the conclusion that Plaintiff did not have mental health or physical impairments that would render Plaintiff unable to work. (*Id.* at 11-12.)

As such, Prudential argues that the independent medical file reviews on shows that its claims' handling was thorough and the decision to terminate Plaintiffs claim was reasonable and supported by substantial evidence. (*Id.* at 12.)

Prudential also argues that its vocational reviews were objective, relied on the information about the occupation in the record, and fully considered the outlined restrictions and limitations. (Doc. 37-1 at 14.) Specifically, Prudential sets out that it considered the restrictions advised by Dr. Grossman for external hearing protection and reinstated benefits until it received information from Oxy that set forth that Plaintiff would rarely have to enter the production area were noise levels were loud, and that all employees were required to wear noise protections. (*Id.*

at 13.) As such, Prudential maintains it was reasonable for it to conclude that Plaintiff could still work at his occupation. (*Id* at 14.)

Prudential next turns to the evidence regarding Plaintiff's daily activities, which it argues supported the conclusion that Plaintiff had the capacity to perform his job. (*Id.*) Specifically, Prudential contends that Plaintiff's Activities of Daily Living Questionnaire ("ADLQ"), in which he reported he could not work due to his physical and mental health issues is contradicted by the fact that he independently drives, goes grocery shopping, and performs lawn care. (*Id.* at 15.)

Prudential also points out that Plaintiff failed to seek further care for his hearing difficulties or medical solutions to allow him to wear hearing aids and hearing protection simultaneously. This inaction, Prudential avers, is inconsistent with Plaintiff's claim that he is disabled due to this condition. Further as to Plaintiff's anxiety, depression, and ADHD, Prudential argues that the record reflects Plaintiff was only seeing his mental health providers once a month or every three weeks. Prudential maintains this shows Plaintiff was stable and had controlled his symptoms. In contrast to Plaintiff's reported issues of lack of concentration, unstable mood, poor memory and confusion, Plaintiff's medical records show that he presented as: oriented to time, place and person; with normal mood and affect; and normal thought process. (*Id.* at 16.)

C. *If the Court agrees with Plaintiff, then remand, not an award of future benefits, is the appropriate remedy*

Prudential argues that if the Court agrees with the Plaintiff, remand for reconsideration of the claim is the appropriate remedy because this case does not show that Prudential acted in an arbitrary and capricious way in denying the benefits. (*Id.* at 18.) Further, because Prudential has not addressed Plaintiff's claims for disability benefits under the any occupation definition of

disability, the Court cannot and should not award future benefits until Prudential has administered that claim. (*Id.*)

2. Plaintiff's response

A. *Plaintiff's disability claim is based on his hearing damage, which is the underlying cause of his attention deficit disorder, anxiety, and depression due to lack of sleep and the fact that he constantly hears ringing and chirping in his ears*

Plaintiff asserts that his severe tinnitus is the underlying cause of his other mental health and medical conditions because of the tinnitus's impact on his life. (Doc. 47 at 1.) Plaintiff argues that after diagnosing the tinnitus, and installing hearing aids, there was no further treatment that Dr. Peters could provide. (*Id.* at 2.) Plaintiff details that his mental health issues all stem from the tinnitus and constant chirping in his ears. (*Id.*) Plaintiff points to the medical evidence that shows the tinnitus grew worse in settings with large groups or loud noises and interrupted his sleep. (*Id.*)

B. *The standard of review is de novo*

Plaintiff argues that because the Summary Plan Description, and not the Plan itself, grants Prudential discretionary authority, the grant of discretionary authority is not sufficient. (*Id.* at 2 (citing *CIGNA Corp. v. Amara*, 563 U.S. 421, 438, 131 S. Ct. 1866, 179 L. Ed. 2d 843 (2011)).)

In the alternative, Plaintiff argues that the Court should apply Texas law, not Delaware law, in this case. Plaintiff explains that while the Oxy Wrap has a choice of law provision favoring Delaware, the Group Contract requires the application of Texas law and the wrap plan's choice of law provision has a carve out of applicable insurance law. (Doc. 47 at 3.) In this case, Plaintiff maintains the applicable insurance law is that of Texas and that the Court should apply Texas's ban on clauses granting plan administrators discretionary authority. (*Id.* at 4.)

CRITICAL

C. *Even under an abuse of discretion standard, Prudential has wrongfully terminated Plaintiff's benefits because there is no evidence supporting the termination of benefits*

Plaintiff likewise argues that Prudential's decision should be overturned because it is not supported by substantial evidence. (*Id.*) Plaintiff asserts that Prudential was motivated to terminate his benefits because less than five days before the "any occupation" period began, Prudential reached out to Mr. Caskey's employer for information. Plaintiff points to the conclusions of Mr. Caskey's treating physician that he was unable to return to his job, Prudential's reviewing doctor's recommendations that he should wear ear protection and avoid loud noises, and the initial vocational analysis that concluded Mr. Caskey's job required exposure to loud noises and frequent communication. (*Id.* at 5.) This evidence belies the conclusion that Prudential's decision is supported by substantial evidence. (*Id.*)

In support of his argument, Plaintiff first points to the conclusions of his treating physicians that he was disabled. Plaintiff provides:

> Dr. Bolter completed an attending physician statement that Prudential received on May 8, 2015 in which he explained that his "condition is severe due to excessive [hearing] loss unlikely to be working given his condition." On August 2, 2016, Dr. Bolter completed a form explaining that Caskey is not being released to work. . . because "he has problems associated with impaired hearing and sounds interfering with his thoughts." Dr. Bolter further explains that his problems have not resolved and appear to be intractable and that he is not able to return to work.

Dr. Bolter explained on August 11, 2016 that Caskey has "anxiety, depression, and severe problems with hearing" and that he cannot return to work. Dr. Bolter completed a form on July 14, 2016 explaining that "he has serious problems related to abnormal hearing and significant problems." (*Id.* at 5.)  He further states that he felt like Caskey is unable to work on a regular and sustained basis. Dr. Bolter completed a form on April 5, 2017 explaining that Caskey has problems "with severe chirping sounds" that causes "depression, tearful, sleep ADHD, and that he has "problems with depression/anxiety; sounds related to chirping that cause problems with

interacting with others." Dr. Bolter states "N/A" when asked to provide a return to work target date.

(Doc. 47 at 5-6.) Therefore, Plaintiff asserts that at least one treating provider concluded that Mr. Caskey could not return to work. (*Id.* at 6.)

Turning to the reviewing providers, Plaintiff argues that each of the independent medical assessments is unreliable because they contradict the medical evidence reviewed. First, Plaintiff contradicts that the medical evidence supports Nurse McCollum's conclusion that Mr. Caskey's tinnitus/chirping was not severe because he had worked without issue for three years prior to filing a claim. Specifically, that the medical evidence from October 14, 2014 details that Mr. Caskey's sleep was limited to two to three hours at night and that he feels like a zombie at work. (*Id.* at 6.) Mr. Caskey also complained about his inability to wear hearing aids and ear plugs simultaneously. (*Id.* at 7.) Therefore, because the medical records contradict the conclusion of Nurse McCollum, Plaintiff states that Prudential should not have relied on it.

As to Dr. Grossman and Dr. Jay, Plaintiff alleges that these medical reviews were conducted through a company with a history of biased reports for the disability insurer and equates to the reviews of hired experts. (*Id.*) Dr. Grossman, Plaintiff argues, still reported that Plaintiff should wear hearing protection around excessive noise and theorized that noise exposure at work likely was the cause of Mr. Caskey's hearing loss. Plaintiff points out that Dr. Grossman did not consider whether Mr. Caskey could return to a work environment with exposure to loud noise, which Plaintiff alleges is an abuse of discretion. Plaintiff argues that any opinion that he should return to the work environment that caused his hearing loss is unreasonable. (*Id.* at 9.)

Dr. Jay's opinion that Plaintiff's mental health conditions were not sufficient to support restrictions or limitations on work, Plaintiff argues, was unreasonable because it contradicted the medical evidence in Mr. Caskey's file on poor memory due to lack of sleep and significant depression and anxiety. (*Id.*) Plaintiff likewise asserts that despite Dr. Jay's concerns that there was no raw data or discussions of validity testing, Mr. Caskey had received such testing. (*Id.* at 9-10.)

As to Dr. Swain and Dr. Clark, Plaintiff argues that the company they are associated with, Reliable Review Services, likewise has a history of providing peer reviews that favor disability insurers. (*Id.* at 11.) Dr. Swain agreed with Dr. Jay's assessment that there were no necessary restrictions from a psychological perspective. This opinion, Plaintiff argues, is unreasonable because of the medical evidence in Plaintiff's records. (*Id.* at 12. In particular, Plaintiff maintains that Dr. Swain's opinion is contrary to the treating physician's testing and conclusions. (*Id.*) Dr. Clark agreed with Dr. Grossman's opinion that the only necessary restriction for Mr. Caskey was ear protection in noisy environments. (*Id.* at 13.) Dr. Clark was not asked if Plaintiff could return to a work environment in an occupation with exposure to loud noise. This omission render's Dr. Clark's opinion unreasonable. (*Id.*)

In total, Plaintiff argues that the medical evidence—even taking into account the peer reviews by Dr. Grossman, Dr. Clark—shows that Mr. Caskey's hearing loss was caused by noise exposure and would worsen in noisy environments. This is sufficient to show that Prudential's decision to terminate benefits was not supported by substantial evidence. The mental health evidence from the peer reviews, Plaintiff argues, is clearly unreasonable and should be disregarded. Further, because none of the reviewing providers conducted an exam in person, Plaintiff states that the Court should not find the accounts reliable. Last, Plaintiff contends that

Prudential's failure to provide the reviewing providers with Mr. Caskey's job description is enough to show an abuse of discretion.

Turning to the vocational reviews, Plaintiff argues that Prudential's claim that it received updated information from Oxy, "shortly after reinstating benefits," is false because it only received that information 5 months after reinstating benefits and 5 days before the "any-occupation period" would have begun. (*Id.* at 16.) Second, Plaintiff argues that Mr. Schwartzkopf, the vocational consultant, did not reach a conclusion or opinion regarding Plaintiff's capacity to perform his regular work, but that the conclusion was instead reached by Ms. Bourget, the Prudential claims manager. (*Id.*) Because talking and hearing are an important part of Plaintiff's job, which his employer confirmed, Plaintiff argues that there is no support that Mr. Caskey is able to perform his previous occupation. (*Id.* at 17.)

Plaintiff also argues that the conclusion that Mr. Caskey's hearing damage would worsen if he returned to his previous job, is one Prudential unreasonably ignored. Ignoring the risk of worsening conditions, Plaintiff asserts, is an abuse of discretion. (*Id.* at 18 (citing *Moore v. Life Ins. Co. of N. Am.*, 2011 WL 10453967, at \*5 (E.D. La. Nov. 28, 2011); *Lasser v. Reliance Standard*, 146 F.Supp. 619 (D.N.J. 2001); affirmed 2003 US App. Lexis 19345 (3d Cir. 2003); *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801 (6th Cir. 2002)).)

Finally, Plaintiff contends that the decision to terminate benefits when there was no improvement of Plaintiff's health was an abuse of discretion. Plaintiff points the Court to both the treating physician's notes regarding continued hearing loss and chirping, and the reviewing physician's notes that his hearing damage is permanent and could worsen with exposure to loud noise. (*Id.* at 18-19.)

D. *Remand is inappropriate*

Plaintiff disputes that remand is the appropriate remedy because: (1) Caskey has waited for more than two years to receive benefits, incurring substantial expenses; (2) this is not similar to cases where remand is appropriate because there are no allegations that Prudential did not comply with ERISA's procedural requirements; and (3) if the Court applies de novo review, there is no reason to remand to Prudential as the Court can simply consider the evidence under review. (Doc. 47 at 19-21.)

E. *Benefits are due through the date of the judgment*

Plaintiff argues that because the "any occupation period" began on April 22, 2017 and Prudential sent a letter explaining that it was terminating benefits effective April 22, 2017, Prudential has already had the chance to review Mr. Caskey's claim for the any occupation period. Plaintiff maintains that by initiating an employability analysis on April 5, 2017, Prudential was considering his any-occupation benefits. (*Id.* at 21-22.) Plaintiff opines that Prudential's decision to cancel benefits days before the any occupation period began was driven by Prudential's discovery that Plaintiff was not employable at any position that would provide Mr. Caskey with 80% of his pre-disability earnings.

Therefore, Plaintiff concludes that the Court should order benefits from April 22, 2017 through the date of judgment and that Mr. Caskey should receive benefits so long as he remains disabled. (Doc. 47 at 22 (citing *Schully v. Cont'l Cas. Co.*, 634 F. Supp. 2d 663, 688 (E.D. La. 2009), *aff'd*, 380 F. App'x 437 (5th Cir. 2010); *Schexnayder v. CF Indus. Long Term Disability Plan for its Employees*, 553 F. Supp. 2d 658, 668 (M.D. La. 2008); *Rucker v. Life Ins. Co. of N. Am.*, 2012 WL 956507, at *23 (E.D. La. Mar. 20, 2012)).)

F. *Prudential's conflict of interest*

Plaintiff maintains that the Court should find Prudential operated with an inherent conflict of interest because of its dual role as a plan administrator and a payor of benefits. (Doc. 47 at 22.) Plaintiff argues that this conflict of interest should be given greater weight as the decision to terminate benefits was procedurally unreasonable because it terminated benefits due to its own financial motivation. (*Id.* at 23.)

G. *Prudential's counterclaim*

Plaintiff argues that any potential counterclaim by Prudential is limited to any alleged overpayment from ongoing monthly benefits. Therefore, Plaintiff maintains that Prudential may not assert a lien against Mr. Caskey's general assets or any Social Security benefits Mr. Caskey received. (*Id.* at 24.) Plaintiff also argues this counterclaim was abandoned when Prudential did not raise it at summary judgment. (*Id.* at 25.)

3. Defendant's reply

A. *The standard of review is abuse of discretion and Prudential's structural conflict of interest should be given little weight*

Prudential argues that the Plan is governed by Delaware law and that discretion is validly vested in Prudential as the Plan's claims administrator. (Doc. 50 at 2.) Under Delaware law, an abuse of discretion standard of review would apply. (*Id.*) Further, Prudential argues that the applicable law in the Oxy Wrap does not differ from that in the long-term disability policy, and to the extent there is a conflict, Delaware law governs. Next, Prudential reiterates that structural bias should not be given much weight because there is no other evidence to show that Prudential was biased in its duty as the claim's administrator. (Doc. 50 at 2 (citing *Holland v. Int'l Paper Co. Ret. Plan,* 576 F.3d 240, 249 (5th Cir. 2009)).)

   B.   *Prudential correctly terminated Plaintiff's claim because he has no medical
        support that he cannot work due to hearing problems*

Prudential argues that for Plaintiff's benefits to continue past two years, he had to provide

proof that he lacked the capacity "to perform the duties of any gainful occupation for which you

are reasonably fitted by education, training, or experience." (Doc. 50 at 3.) Given that Plaintiff's

physical limitation was limited to finding a job that accommodated hearing aids, Prudential

argues that its determination that he no longer met the Plan's terms was reasonable. (*Id.*)

Prudential sets out that physically, Plaintiff's only medically necessary restriction is to

wear hearing protection in areas with noise above 105dB. (*Id.*) Plaintiff's occupation rarely

exceeded sound levels of 100 dB, and if noise rose above 105dB, hearing protection was

required. (*Id.*) Therefore, Prudential argues that Mr. Caskey had the capacity to perform his

regular occupation. (*Id.*) Prudential also highlights that Plaintiff relies on statements from

Plaintiff's neuropsychologist—not an otolaryngologist—as support for his physical disability

due to his hearing loss. (*Id.*)

Prudential also argues that the independent medical reviewers' opinions are not

unreliable and refutes the argument that the independent medical reviewers should have

scheduled an in-person exam by pointing out that Plaintiff declined to attend an exam scheduled

by Prudential. (Doc. 50 at 4.)

   C.   *Prudential has not abandoned its counterclaim*

Last, Prudential refutes that it has abandoned its counter claim for recoupment of

overpayment based on Plaintiff's receipt of Social Security Disability Benefits. (*Id.* at 4.)

Prudential states:

> In this case, both sides agree that, in exchange for the Plan advancing Plan assets
> not otherwise due, when the Plaintiff receives a duplicate payment of those funds
> from the Social Security Administration, he will repay them in recognition of the
> fact he has become a fiduciary holding Plan assets, not his own.

(*Id.* at 5.)

b. *Plaintiff's Motion for Summary Judgment*

   1. <u>Plaintiff's arguments in support</u>

      A. <u>*Prudential's decision should be reviewed de novo*</u>

Plaintiff argues that the Court should apply Texas law in this matter because the

Disability Policy states that the governing jurisdiction is Texas and that the policy will be

governed by the laws of Texas. (Doc. 38-1 at 6.) Texas law bans discretionary clauses in

disability contracts, which precludes the grant of discretionary authority in this case. (*Id.*) Under

a *de novo* standard, Plaintiff argues that he must satisfy a preponderance of the evidence standard

to show that he is disabled under the policy. (*Id.* at 7.)

In the alternative, if the Court applies an abuse of discretion standard of review, then

Plaintiff asserts that Prudential abused its discretion because it: (1) denied Plaintiff's disability

benefits in bad faith; and (2) made a decision not supported by the medical evidence.

      B. <u>*Prudential has unlawfully denied Plaintiff's disability benefits in bad faith*</u>

Plaintiff argues that Prudential denied his benefits in bad faith because

> Prudential realized that it would not be able to find alternative occupations that
> would pay Caskey 80% of his pre-disability earnings considering his education,
> training, experience, and his hearing damage. So on April 17, 2017 (i.e. 5 days
> before the end of the "own occupation" period), Prudential reached out to Caskey's
> employer fishing for information to support that Caskey can perform his previous
> occupation. (despite just recently concluding a lengthy review resulting in the
> conclusion that he could not in fact perform such an occupation for the duration of
> the own occupation period). On April 20, 2017, i.e. the day before the end of the
> "own occupation" period, Prudential received an email from Plaintiff's former
> employer's Labor Relations Supervisor in which he answered several questions
> from Prudential. The next day on April 21, 2017 Prudential terminated his benefits,
> claiming that the new information provided by his employer justified terminating
> benefits effective April 22, 2017.

(Doc. 38-1 at 9-10.) This series of events, Plaintiff contends, is highly unusual and demonstrates

that Prudential acted for its own financial benefits. (*Id.* at 10.)

      *C.*  *Plaintiff's disability prevents him from performing the material duties of his occupation*

Plaintiff likewise argues that Prudential's decision that the medical evidence supported the decision that Mr. Caskey was able to perform his own occupation was unreasonable. Plaintiff maintains that "it is totally unreasonable to suggest that someone with Caskey's hearing damage should be able to perform a job that requires exposure to loud noises and frequent hearing and talking." (*Id.* at 11.) Further, Plaintiff asserts that Prudential should have credited Mr. Caskey's declaration, which explained that the ear protection worn at the plant was not sufficient to block the noise from high pressure steam emitted from the pipes, that the ringing and chirping in his ears prevents sleep and caused anxiety and depression. (*Id.* at 11.) Mr. Caskey maintains that he cannot wear hearing aids and ear plugs at the same time, so he cannot perform his occupation. (*Id.*) Plaintiff also points to a letter from Mr. Caskey's longtime girlfriend who reported on the impacts his hearing loss has had on his life. (*Id.* at 11-12.)

Next, Plaintiff argues the information received from Plaintiff's employer on April 20, 2017 did not justify terminating benefits because it reiterated that Plaintiff's job required exposure to loud noises. Plaintiff details that this is in agreement with Plaintiff's literature explaining OSHA's assessments of the physical hazard of hearing loss from working in a chemical plant, and Prudential's prior decision underlines that Plaintiff could not work at his occupation. (*Id.* at 12.)

Plaintiff concludes that the only reason Prudential sought further information from Plaintiff's employer was to deny the "own occupation claim" because it could not find an alternative occupation that would meet the policy's earnings threshold. (*Id.* at 13.)

2. Underline{Defendant's response}

    A. *The standard of review is abuse of discretion*

Prudential argues that the Plan is governed by Delaware law, Delaware law does not

prohibit discretionary clauses, and therefore the Plan's discretionary clause is valid. (Doc. 44 at

3.) As such, Prudential maintains that the standard of review is abuse of discretion. (*Id.*) Under

the abuse of discretion standard, Prudential argues that there is no evidence of bias or procedural

errors that would lead the Court to give any heightened level of scrutiny due to its structural

conflict of interest. (*Id.* at 4.)

Prudential refutes Plaintiff's contention that its independent medical reviewers are biased,

highlighting that the litigation history does not demonstrate bias. (*Id.* at 4-5 (citing *Tortora v.

SBC Communications, Inc.*, 739 F. Supp. 2d 427, 440 & n.105 (S.D.N.Y. 2010) (internal

citations omitted) (finding "no basis" to assume that a disability determination must be biased

because the insurer used independent physician advisors that were cited in other court cases;

"these statistics cannot prove bias on the part of [those] reviewers. Litigation only arises when

physicians find that claimants are not disabled, and benefits are denied accordingly; if the

claimants were found eligible for disability benefits, there would be no litigation."); *Peterson v.

Fed. Express Corp. Long Term Disability Plan*, No. 05-1622, 2007 WL 1624644, at \*22 (D.

Ariz. June 4, 2007) ("Nor does the reviewers' rejection of claims in several reported cases

demonstrate bias. The vast majority of claims do not become the subject of litigation, so the

cases are unlikely to be a representative sampling, particularly if one considers that litigated

benefits decisions are generally more likely to involve close questions.")).)

Prudential reiterates that the record does not show any evidence of bias claims handling

or procedural errors. (*Id.* at 5.)

B. _Prudential's decision to terminate Plaintiff's claim was reasonable and correct_

Prudential maintains that as set out in its _Memorandum in Support of Summary Judgment_ (Doc. 37-1, _supra_ Section (a)(1)(B)), its decision to terminate Plaintiff's claim was reasonable and correct. (_Id._) Prudential details that its determination was supported by: (1) internal medical reviews; (2) four separate independent medical reviews (plus two addendum reviews; and (3) a vocational review. (_Id._)

Prudential argues its decision was reasonable because the medical evidence did not establish that Plaintiff could work in his regular occupation as a shift supervisor at Oxy. (_Id._ at 6.) Prudential also outlines that the independent medical reviewer's opinions were not unreasonable and in fact agreed with the treating provider's opinions regarding necessary restrictions. (_Id._ at 7.)

Prudential also asserts that it was reasonable and correct to update its review with Mr. Caskey's specific job description. (Doc 44 at 7-8 (citing _Robinson v. Aetna Life Ins. Co._, 443 F.3d 389, 396 (5th Cir. 2006) (rejecting insurer's argument that evidence of claimant's specific job duties are irrelevant under general interpretation of the "own occupation" standard); _Burtch v. Hartford Life and Acc. Ins. Co._, 314 F. App'x. 750, 755 (5th Cir. 2009) (noting that "while the correct standard is the occupation in the general economy and not the specific job for a specific employer, the specific duties of the employee's job, as described by the employer, are relevant.").) The specific duties of an employee's job illustrate the material duties of an individual in the same occupation in the general economy. Prudential argues it would have been an abuse of discretion to not consider the specific duties, if there is evidence that the job he was doing does not match the general description. (Doc. 44 at 8.)

Prudential contends that there is no evidence regarding Plaintiff's theory of Prudential's motivations, and argues that these argumentative statements should not be considered under Rule

42

56(e). (Doc. 44 at 9.) In the alternative, Prudential argues that the record shows Plaintiff is incorrect because Prudential reached out to Oxy after realizing that it had not done so already. (Doc. 44 at 10.) Finally, Prudential concludes that approval of benefits for some period of time does not necessitate approval of benefits for the duration of the claim, and it was not highly unusual for Prudential to terminate benefits when it did. (*Id.* at 10-11.)

3. Plaintiff's reply

Plaintiff reiterates his arguments that the standard of review is de novo. (Doc. 53 at 1-2.) Plaintiff further argues that Mr. Caskey's specific job duties are relevant, but the timing of Prudential's updated request for information of his employer demonstrates that Prudential terminated Mr. Caskey's benefits in bad faith. Plaintiff provides,

> [O]n April 5, 2017 Prudential initiated an employability assessment ("EA") in an attempt to find jobs that would provide Caskey with 80% of his pre-disability earnings. Thereafter the file does not contain a copy of the employability assessment but rather Prudential reaches out to Caskey's employer for specific information on April 17, 2017 for clarification of Caskey's job duties. After receiving such clarification on April 20, 2017, Prudential issued a denial letter the next day.

(*Id.* at 3.) Plaintiff argues that this timing is suspect and shows that Prudential was motivated by its financial benefit to deny this claim. (*Id.*) Plaintiff also argues that this timing shows a bias indicating Prudential was motivated by its own financial incentive. (*Id.* at 4.)

Plaintiff argues that Prudential's decision was not reasonable because Plaintiff was restricted from avoiding loud noises and wearing hearing protection in loud areas. (*Id.* at 5.) Plaintiff insists that the medical evidence had not changed from the initial decision to award benefits to when Prudential denied benefits. (*Id.* at 5-8.) Ultimately, Plaintiff argues it was unreasonable to suggest that Mr. Caskey return to a job that was more likely to cause his hearing damage. (*Id.* at 9.)

43

<u>DISCUSSION</u>

a.  *ERISA standards for reviewing a claim of denial of benefits*

The Employment Retirement Income Security Act, or ERISA, provides that a district

court may review the benefit decisions of plan administrators or fiduciaries. Specifically, 29

U.S.C. § 1132(a)(1)(B) sets forth that an individual may bring a civil action "to recover benefits

due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to

clarify his rights to future benefits under the terms of the plan . . ." 29 U.S.C. § 1132.

As the Supreme Court has held,

[a] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956–57, 103 L. Ed. 2d

80 (1989).

1.  <u>The Plan's applicable law is Delaware</u>

The parties dispute the standard of review to be used in this case. Specifically, the parties

dispute whether the Plan gives Prudential discretion. Plaintiff argues that Texas law applies and

Texas' ban on discretionary clauses in long term disability contracts means that the standard of

review is *de novo*. Prudential argues that Delaware law applies and that the Plan gives Prudential

the discretion to determine eligibility for benefits and to construe the terms of the Plan.

Therefore, Prudential maintains that the standard of review is abuse of discretion.

The parties' dispute centers on the fact that there is a difference in the governing

jurisdictions between the Group Contract and the other Plan documents.  Section 10.9 of the Oxy

Wrap, entitled Governing Law, states, "The Plan shall be construed, administered and governed

in all respects under the applicable laws of the State of Delaware, except to the extent preempted

44

by federal law, or governed by the applicable insurance law." (Doc. 20-1 at 19.) The Group

Contract states, "The Group Contract is delivered in and is governed by the laws of the

Governing Jurisdiction." (Doc. 20-1 at 151.) The Group Contract defines that the Governing

Jurisdiction is the "State of Texas." (*Id.* at 152.)

However, the Court agrees with the Defendant that Delaware law applies because the

Oxy Wrap and the Oxy SPD detail that the Plan is the controlling document if a conflict exists

between provisions. The Oxy SPD states, "If a conflict exists between a statement in this

summary and the provisions of the Plan document or any applicable contract, the Plan document

will govern. (Doc. 20-1 at 57.) The Oxy Wrap states in Section 1.2, Governing Documents, that

"[f]or each insured Benefit Program, all matters relating to eligibility, period of coverage, and

other terms and conditions of coverage shall be governed solely by the terms of the applicable

insurance contract, except as otherwise specifically provided in this instrument." (Doc. 20-1 at

4.) The Group Contract, in contrast, does not contain any provision that states the Group

Contract controls over any other Plan document if there is a conflict between provisions. Further,

the provisions of the Group Contract are limited to the terms and conditions of premium

payments between Oxy and Prudential.[1] The Group Contract does not define or set out how an

employee files for long-term disability, the claims process, or any of Prudential's responsibilities

as the claim's administrator. Therefore, the Court concludes that Delaware law applies.

---

[1] The Group Contract consists of

> The entire Group Contract consists of: (1) the Group Insurance Certificate(s) listed in the Schedule of Plans, a copy of which is attached to the Group Contract; (2) all modifications and endorsements to such Group Insurance Certificates which are attached to and made a part of the Group Contract by amendment to the Group Contract; (3) the forms shown in the Table of Contents as of the Contract Date; (4) the Contract Holder's application, a copy of which is attached to the Group Contract; (5) any endorsements or amendments to the Group Contract; and (6) the individual applications, if any, of the persons insured.

(Doc. 20-1 at 156.)

2.   The Plan documents grant Prudential the discretionary authority to determine eligibility
for benefits and construe the terms of the Plan.

As Prudential argues, the Plan documents grant Prudential the discretionary authority to

determine eligibility for benefits and construe its terms. The Plan states:

> The Plan Administrator shall have the exclusive right to interpret the terms and
> provisions of the Plan and to resolve all questions arising thereunder, including
> without limitation the right to resolve and remedy ambiguities, inconsistencies, or
> omissions in the Plan . . . All findings of fact, interpretations, determinations, and
> decision of the Plan Administrator with respect to any matter or question arising
> under the Plan, shall be final, conclusive, and binding upon all persons having or
> claiming to have any interest in or right under the Plan, and shall be given the
> maximum possible deference allowed by law.

(Doc. 20-1 at 13.) The Plan Administrator "means the person, committee, or Oxy as designated

pursuant to Section 8.1." (*Id.* at 115.) The Plan further states, "The Plan Administrator may

appoint one or more persons or organizations to aid it in carrying out its duties and delegate such

of its power and duties as it deems desirable to such persons or organizations." (*Id.* at 13.)

Section 8.1 details that Oxy serves as the Plan Administrator and may designate and delineate

additional fiduciaries in the Oxy SPD. (*Id.*)

The Oxy SPD details that the Plan Administrator is the Occidental Petroleum Corporation

Employee Benefits Committee, the Claims Fiduciary is Prudential, and the Claims Administrator

is Prudential. (*Id.* at 58.) The Oxy SPD details that

> Prudential, as the Claims Administrator, will decide your claims and appeals.
> Prudential has the exclusive discretionary authority to interpret LTD Plan
> provisions as well as to determine facts and other information related to claims and
> appeals. Prudential's decisions are conclusive and binding.

(*Id.* at 56.) As such, the Plan documents grant Prudential discretion to interpret and determine

facts under the Plan, as the Claims Fiduciary and Claims Administrator.[2]

---

[2] Plaintiff argues that under *CIGNA Corp. v. Amara*, 563 U.S. 421, 437, 131 S. Ct. 1866, 1877, 179 L. Ed. 2d 843 (2011), the statement in the summary plan description is not binding and cannot grant Prudential authority as the claims administrator. However, the Court finds that *Amara* is distinguishable. As the Fifth Circuit explained in *Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan,*

46

Delaware law permits long term disability plans to include discretionary clauses.

Therefore, the Court concludes that the abuse of discretion standard is appropriate. *Ariana M. v.*

*Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) ("When an ERISA plan

lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial

of a claim is limited to assessing whether the administrator abused that discretion.")

(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d

80 (1989)); *see Ramirez v. United of Omaha Life Ins. Co*., 872 F.3d 721, 725 (5th Cir. 2017)

("We note that in suits brought under 29 U.S.C. § 1132(a)(1)(B), district courts generally review

the denial of disability-benefits claims *de novo* when the administrator or fiduciary does not have

discretionary authority to determine eligibility for benefits or to construe the terms of the

plan. But if the benefits plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan, the denial of benefits is

reviewed for an abuse of discretion.").

3.  <u>The abuse of discretion standard</u>

---

*Amara* arose from a dispute between CIGNA and its pension plan's beneficiaries. Until 1997, CIGNA had a traditional defined-benefit pension plan. It issued an SPD announcing changes while assuring beneficiaries that the new plan would provide "the same benefit security" with "steadier benefit growth." *Id*. at 426–28, 131 S.Ct. 1866. Eleven months later, CIGNA rolled out its new written instrument, which reduced benefits considerably. *Id*. at 426–31, 131 S.Ct. 1866. The beneficiaries challenged CIGNA's adoption of the new plan. *Id*. at 424, 131 S.Ct. 1866.

The United States submitted a brief as *amicus curiae* urging that the (more favorable) terms of the SPD should govern rather than the (less favorable) terms of the written instrument. The Court rejected the premise that SPDs are inherently enforceable: "[W]e cannot agree that the terms of statutorily required plan summaries ... *necessarily* may be enforced ... as the terms of the plan itself." *Id*. at 436, 131 S.Ct. 1866 (emphasis added). The Court added that a plan's written instrument contains its terms. *Id*. at 436–38, 131 S.Ct. 1866.

858 F.3d 340, 345 (5th Cir. 2017). Therefore, the Fifth Circuit concluded that "courts have blessed the practice" of an "SPD . . . functioning as both an SPD and a written instrument." *Rhea*, 858 F.3d at 344. This is not the case here since in *Amara*, the terms of the plan's written instrument were in conflict with the summary plan description and the plaintiff sought to rewrite the plan to comply with the summary plan description. In this case, the Oxy Wrap incorporates the Oxy SPD as a part of the Plan, and the Oxy Wrap specifically states that discretionary authority can be designated by the Plan Administrator to a claims administrator in the Oxy SPD. (Doc. 20-1 at 13.) The Oxy SPD names Prudential as the Claims Fiduciary and Claims Administrator. Because the Oxy SPD is incorporated into the Plan, and is consistent with the Oxy Wrap, the Court finds that *Amara* is distinguishable in this case.

"Where a plan administrator has discretion, as here, [the Court] review[s] the administrator's denial of benefits deferentially for abuse of discretion." *Rittinger v. Healthy All. Life Ins. Co.*, 914 F.3d 952, 955 (5th Cir. 2019) (footnotes omitted); *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956–57, 103 L. Ed. 2d 80 (1989); *Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 269 (5th Cir. 2004) ("When the ERISA plan vests the fiduciary with discretionary authority to determine eligibility for benefits under the plan or to interpret the plan's provisions, 'our standard of review is abuse of discretion.'"). The Fifth Circuit instructs,

> [D]istrict courts hearing complaints from disappointed ERISA plan members or their beneficiaries for the administrative denial of benefits are *not* sitting, as they usually are, as courts of first impression. Rather, they are serving in an appellate role. And, their latitude in that capacity is very narrowly restricted by ERISA and its regulations, as interpreted by the courts of appeals and the Supreme Court, including the oft-repeated admonition to *affirm* the determination of the plan administrator *unless* it is "arbitrary" or is not supported by at least "substantial evidence"—even if that determination is *not* supported by a preponderance.

*McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 456–57 (5th Cir. 2014).

Further, the Fifth Circuit has described the abuse of discretion standard stating, "a plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Rittinger*, 914 F.3d at 956 (quotations and footnotes omitted). "Yet [i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail." *Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004). Therefore the Court must determine first determine if the administrator's decision was supported by substantial evidence. In this context, "[s]ubstantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Importantly, "[t]he law requires only that substantial evidence support a plan fiduciary's decisions, including those to

deny or to terminate benefits, *not* that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *Id.* Therefore, there is "no law that requires a district court to rule in favor of an ERISA plaintiff merely because he has supported his claim with substantial evidence, or even with a preponderance." *Id.*

Next, the Court must determine if a plan administrator's decision is arbitrary and capricious. In determining whether a plan administrator's decision is arbitrary and capricious, the Fifth Circuit instructs that, "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246–47 (5th Cir. 2009).

Finally, as a factor to whether Prudential abused its discretion, the Court must consider whether Prudential operated under a conflict of interest. As the Fifth Circuit explained:

> We presume a structural conflict of interest where "the insurer of the plan also determines whether the claimant is entitled to benefits," *White*, 892 F.3d at 767 (citing *Glenn*, 554 U.S. at 108, 128 S. Ct. 2343), because the insurer "potentially benefits from every denied claim," *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 470 (5th Cir. 2010) (citation omitted). A conflict is one "of several different considerations," *Glenn*, 554 U.S. at 117, 128 S. Ct. 2343, that "must be weighed as a factor in determining whether there is an abuse of discretion," *id.* at 111, 128 S. Ct. 2343 (cleaned up).

*Nichols v. Reliance Standard Life Ins. Co.*, 924 F.3d 802, 813 (5th Cir. 2019), *cert. denied,* 140 S. Ct. 186, 205 L. Ed. 2d 136 (2019). As Prudential is both the insurer of the plan and the claims administrator, a structural conflict of interest is presumed to exist in this case. To determine what weight to give a structural conflict of interest, the Fifth Circuit instructs:

> We weigh the conflict "depending upon the circumstances of a particular case." *Schexnayder*, 600 F.3d at 470. A structural conflict may "prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision," such as "where an ... administrator has a history of biased claims administration," *Glenn*, 554 U.S. at 117, 128 S. Ct. 2343, or where "circumstances surrounding the plan administrator's decision suggest procedural unreasonableness," *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 509 (5th Cir. 2013) (internal quotation marks and citation omitted).

49

*Id.*

In addition, "a reviewing court may give more weight to a conflict of interest, where the circumstances surrounding the plan administrator's decision suggest 'procedural unreasonableness.'" *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) (citing *Glenn,* 128 S. Ct. at 2352). For example, the Fifth Circuit found procedural unreasonableness when in denying a claim, a plan administrator did not acknowledge any conflicting evidence it reviewed in making its determination. *Schexnayder*, 600 F.3d at 471 ("Failure to address a contrary SSA award can suggest "procedural unreasonableness" in a plan administrator's decision.") As such, "procedural unreasonableness is important in its own right and also justifie[s] the court in giving more weight to the conflict." *Id.*

In sum, the Court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *Holland*, 576 F.3d at 246–47 (quoting *Corry v. Liberty Life Assurance Co. of Boston,* 499 F.3d 389, 398 (5th Cir.2007) (quotation marks omitted). Therefore, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Id.* Further, given the deference the Court must give Prudential's decision, the burden is on the Plaintiff to show that Prudential abused its discretion. *White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 770 (5th Cir. 2018), *as revised* (June 14, 2018). ("[Plaintiff] bears the burden to prove that substantial evidence does not support [the plan administrator's] position.").

### b.  *Whether Prudential was operating under a conflict of interest*

In this case, Plaintiff argues that the Court should give greater weight to Prudential's conflict of interest because Prudential's decision to terminate benefits on the last day of the "own occupation period" demonstrates bad faith. Plaintiff's argument seems to be that the timing

speaks for itself and shows Prudential was motivated by financial considerations in making the termination decision. Outside of these arguments regarding timing, Plaintiff does not present evidence to show circumstances that "suggest a higher likelihood that it affected the benefits decision, such as where an . . . administrator has a history of biased claims administration." *Nichols*, 924 F.3d at 813.

Further, the administrative record shows that Prudential took steps to minimize a conflict of interest, including consulting independent medical experts, in making its decision during each of Plaintiff's appeals. *Holland*, 576 F.3d at 249 (explaining that steps to minimize a conflict of interest include a plan administrator, submitting "applicants' records to independent medical professionals who have affirmed that they have no conflict of interest and that their compensation 'is not dependent, in any way, on the outcome of this case.'"). Plaintiff argues that the independent medical reviewers' conclusions are biased because Dr. Jay, Dr. Grossman, Dr. Clark, and Dr. Swain were merely paid experts that gave Prudential the results that they sought. Plaintiff points out that in caselaw where these reviewers' names are mentioned, they have given an opinion supporting the denial of disability benefits. This caselaw history of supporting a denial of disability benefits shows their bias and renders the conclusions unreliable.

The Court does not agree. The fact that a caselaw search of the independent reviewers revealed reports supporting the denial of benefits does not conclusively show bias. As the Southern District of New York noted, "Litigation only arises when physicians find that claimants are not disabled, and benefits are denied accordingly; if the claimants were found eligible for disability benefits, there would be no litigation." *Tortora v. SBC Commc'ns, Inc.*, 739 F. Supp. 2d 427, 440  n.10 (S.D.N.Y. 2010), *aff'd,* 446 F. App'x 335 (2d Cir. 2011) (internal quotation marks omitted). Because litigation only arises in cases where benefits are denied and that

decision is not reversed at the administrative level, the vast majority of claims are never subject to litigation. Therefore, the reported caselaw is not a representative sample of any of the independent medical reviewers' history in supporting or denying claims. *Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV-05-1622-PHX-NVW, 2007 WL 1624644, at *22 (D. Ariz. June 4, 2007) ("Nor does the reviewers' rejection of claims in several reported cases demonstrate bias. The vast majority of claims do not become the subject of litigation, so the cases are unlikely to be a representative sampling, particularly if one considers that litigated benefits decisions are generally more likely to involve close questions.") The Court concludes that it was reasonable for Prudential to consider the conclusions of the independent medical reviewers in this case.

The Court "weighs the structural conflict as one of the many factors relevant to the benefits determination decision." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010). Because the Plaintiff presents arguments regarding Prudential's bias but has not presented evidence showing that a conflict of interest influenced Prudential's benefits decision, the Court concludes that the conflict of interest is not a significant factor.

c. *Whether Prudential's decision to terminate Plaintiff's long-term disability benefits was supported by substantial evidence*

Plaintiff argues that Prudential's decision to terminate Mr. Caskey's benefits was not supported by substantial evidence because: (1) the medical evidence shows no change or improvement of Plaintiff's hearing loss and tinnitus between November 17, 2016 (when benefits were reinstated) and April 22, 2017 when Prudential terminated benefits; (2) Prudential's vocational review should not have updated its review with the information provided by Oxy concerning the workplace and personal protective equipment worn by Oxy employees; and (3) Prudential's independent medical reviewers' opinions are biased and therefore unreliable.

Plaintiff contends that the only credible conclusions are those of Dr. Bolter in support of finding Mr. Caskey is disabled and Mr. Caskey's declarations concerning his inability to work.

Prudential maintains that the decision to terminate was reasonable and correct and that the administrative record shows that Mr. Caskey's physical conditions and mental health conditions did not meet the definition of disability under the Plan because he was able to perform the duties of his regular occupation.

The Court reiterates that its "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *Holland*, 576 F.3d at 246–47. The Court likewise is aware that substantial evidence is more than a scintilla, but less than a preponderance. *Ellis*, 394 F.3d at 269.

First, Plaintiff is correct that the medical evidence regarding his physical and mental health conditions did not change between the time Prudential reinstated benefits in November 17, 2016 and April 22, 2017. However, Prudential's decision to reinstate benefits and then to terminate benefits depended on both the medical evidence it reviewed, and the limits/restrictions suggested by the otolaryngologists and the vocational review by Mr. Schwartzkopf. Therefore, while the medical evidence did not change, the vocational review was updated to take into account details of Plaintiff's work environment and duties.

The Eastern District of Louisiana explained the relevant inquiry for determining the duties of an employee under the own occupation standard, stating:

> The Fifth Circuit has apparently sided with the "general" approach for determining the duties of an occupation under the "own occupation" standard. *See Robinson v. Aetna Life Ins. Co.,* 443 F.3d 389, 396 (5th Cir.2006) (explaining that the correct interpretation of the "own occupation" standard is the occupation in the general economy, as opposed to a specific job for a specific employer); *see also House v. Am. United Life Ins. Co.,* 499 F.3d 443, 453–54 (5th Cir.2007) (finding that

53

plaintiff's "regular occupation" was that of an attorney with duties as they are found in the general economy, "not restricted to his own specific job as a litigation attorney with a uniquely stressful practice").

Nonetheless, even under this "general" formulation of the own occupation standard, evidence of a claimant's specific job duties is not irrelevant. *See Robinson*, 443 F.3d at 396. (rejecting insurer's argument that evidence of claimant's specific job duties are irrelevant under general interpretation of the "own occupation" standard); *see also Burch v. Hartford Life and Acc. Ins. Co.,* 314 F. App'x. 750, 755 (5th Cir.2009) (noting that "while the correct standard is the occupation in the general economy and not the specific job for a specific employer, the specific duties of the employee's job, as described by the employer, are relevant").

To the contrary, as both the Fifth Circuit and other courts have recognized, the specific duties of the employee's job, as provided by the employer, serve to *illustrate* the material duties of an individual in the same occupation in the general economy. *See, e.g., Robinson,* 443 F.3d at 396 ("Robinson's duties at Glazer serve to illustrate the duties that a sales representative at a comparable firm might perform."); *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 253 (2d Cir.1999)("Though her precise duties do not define her regular occupation, in this case they well illustrate the duties of a director of nursing at a small health care facility, and nothing in the record provides any basis for thinking that such a position at a facility comparable to hers requires [different duties].").

*Rucker v. Life Ins. Co. of N. Am.*, No. CIV.A. 10-3308, 2012 WL 956507, at *9 (E.D. La. Mar. 20, 2012).

The administrative record in this case shows that Prudential's vocational reviewers struggled with defining the duties and work environment of Plaintiff's own occupation was and vacillated between definitions of shift supervisor and production supervisor. When Prudential learned more about the occupational environment at the Oxy plant where Mr. Caskey was employed, Mr. Schwartzkopf reevaluated whether the ongoing limitations regarding hearing protection would limit Plaintiff's ability to perform his own occupation as a shift supervisor. The Court agrees that the specific work environment and job duties Mr. Caskey performed at Oxy were relevant to the vocational review. Further, given that the central question in determining if Plaintiff could perform his own occupation was what type of noise he would encounter on a typical workday, it was not unreasonable for the information from Oxy to be considered in Mr.

Schwartzkopf's analysis. The Court concludes that it was not an abuse of discretion for Prudential to take into account the information provided by Oxy in conducting the vocational review.

Further, Prudential relied on the overwhelming medical evidence from both Plaintiff's treating providers and the four independent medical reviewers to conclude that the only limits/restrictions on Mr. Caskey's ability to work were indefinite limitations suggested by Dr. Grossman and agreed to by Dr. Clark of: "Combined ear protection utilizing both ear plugs and external muffs in work areas where sound levels approach or exceed 105 dB; Removal for 15 minutes every two hours from areas of 105 dB or greater sound levels." (Doc. 20-2 at 230.) Plaintiff's declarations in support of his own disability and complaints that he could not wear hearing aids and earplugs at the same time do not show Prudential's decision to terminate was not supported by substantial evidence. The Court notes that earplugs are not the only type of hearing protection recommended by the otolaryngologists in the administrative record. Dr. Grossman explained,

> Properly fitted earplugs or muffs reduce noise 15 to 30 dB. The better earplugs and muffs are approximately equal in sound reduction, although earplugs are better for low frequency noise and earmuffs for high frequency noise. Simultaneous use of earplugs and muffs usually adds 10 to 15 dB more protection than either used alone. Combined use should be considered when noise exceeds 105 dB.

(*Id.* at 229.) Based on Oxy's information, Mr. Caskey's job duties rarely placed him in areas where the noise exceeded 105 dB, where both earplugs and earmuffs should be worn. Plaintiff has not shown how he would be unable to wear both hearing aids and earmuffs simultaneously.

Plaintiff also contends that Prudential should have given more weight to the conclusions of Dr. Bolter and Dr. Cole that his mental health conditions severely impacted his ability to work. The only treating provider who supported Plaintiff's final appeal was Dr. Bolter, who was Mr. Caskey's treating neuropsychologist. Dr. Bolter's updated Attending Physician Behavioral

Health Statement was submitted in support of Plaintiff's appeal. In the updated statement, Dr.

Bolter, in response to the question, "Did you recommend this patient to be off work?",

responded, "No". (Doc. 20-2 at 721.) Dr. Bolter indicates that Mr. Caskey "appears to have

problem with severe chirping sounds" and provides that "he expresses problems with

depression/anxiety. Sounds related to chirping that cause problems with interacting with others."

(*Id.*) The Court notes that as a neuropsychologist, Dr. Bolter was not specialized in diagnosing or

treating hearing issues and yet provided tinnitus as his explanation for why Plaintiff could not

work. It bears repeating, despite Plaintiff submitting Dr. Bolter's updated Attending Physician

Behavioral Health Statement in support of his final appeal, Dr. Bolter himself did not

recommend that Mr. Caskey should be off work. (*Id.*)

      The Supreme Court has held that "courts have no warrant to require administrators

automatically to accord special weight to the opinions of a claimant's physician; nor may courts

impose on plan administrators a discrete burden of explanation when they credit reliable

evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v.

Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003). Further the Fifth

Circuit has instructed that "it is the role of the ERISA administrator, not the reviewing court, to

weigh valid medical opinions." *Killen v. Reliance Std. Life Ins. Co.*, 776 F.3d 303, 309 (5th Cir.

2015); *see Wittmann v. Unum Life Ins. Co. of Am.*, No. CV 17-9501, 2019 WL 763509, at *15

(E.D. La. Feb. 21, 2019), *aff'd*, 793 F. App'x 281 (5th Cir. 2019) (citing *Love v. Dell, Inc.*, 551

F.3d 333, 337 (5th Cir. 2008) ("ERISA does not require the opinions of treating physicians to be

preferred over those of other physicians reviewing a file; ERISA merely requires that the

opinions of treating physicians, as with all evidence submitted by the claimant, actually be taken

in account in an administrator's determination.")).

Prudential provided all of Plaintiff's medical records to the independent medical reviewers, and in its discretion relied on the conclusions of those reviewers. During Plaintiff's appeals, Prudential relied on the opinions of Dr. Jay and Dr. Swain relating to Plaintiff's mental health conditions. In her review, Dr. Swain concluded:

> The claimant has a chronic history of anxiety and depression that have been repeatedly documented in the medical records as "some chronic symptoms." There has never been any objective assessment of the severity of his emotional issues. There has never been presented a listing of symptoms, signs, and behaviors warranting diagnosis of anxiety or depression. Apparently psych testing was completed in late 2014 or early 2015, but no report was ever produced or at least made available as part of the claimant's record. There was never even provided a test score data sheet. There was reference made to the testing by Dr. Bolter, but no actual scores were provided and no discussion was made regarding the performance validity of the evaluation. The claimant reportedly made complaints of attentional issues and apparently claimed that he was previously diagnosed with ADHD, but there is no documentation of symptoms to support the presence of a neurodevelopmental attentional disorder. This does not dismiss that the claimant may have been experiencing a degree of distress, but the records fail to provide evidence to support psychiatric diagnoses of sufficient severity to warrant restrictions or limitations in the claimant's ability to function. The claimant has been under care for psychotropic medications and psychotherapy, but his frequency of visits for medications generally has only been once per month to three months with psychotherapy, he was never seen more frequently than once every two weeks. There was never any mention of the need for more frequent visits or any need for more intensive care. This would support a mild severity to any emotional complaints.

(Doc. 20-2 at 313.)

Prudential provided Plaintiff's medical records to independent medical reviewers Dr. Grossman and Dr. Clark relating to his hearing loss and tinnitus. During the final appeal Dr. Clark detailed:

> The claimant should wear ear protection when exposed to significant noise levels. The claimant has clinical evidence of hearing loss bilaterally consistent with noise exposure loss. Continued exposure to a noisy environment could worsen the hearing loss. . . This is a permanent restriction .

(*Id.* at 318.) Dr. Clark further reported, "The hearing loss is of the type that may cause tinnitus or a high pitched noise. The degree of the tinnitus is subjective (self-reported) and cannot be

57

determined with the standard audiogram since the symptom is subjective. There appears to be some psychological issues which could reduce his ability to cope with the tinnitus. The chirping sounds would be an unusual description of the tinnitus." (*Id.* at 319.) Dr. Clark further opines, "His hearing loss while being significant is not severe enough on its own to disable the claimant. As noted above the tinnitus, while being present would not be disabling. The psychological aspects of the case including concentration difficulties are not in this reviewer's purview. If appropriate ear protection is used the claimant should not be precluded from his job duties as a production manager." (*Id.*)

Ultimately, the consensus recommendation in the final appeal from Dr. Clark and Dr. Swain states,

> [T]he claimant does suffer from hearing loss that is likely noise-induced, in addition to tinnitus and depression and anxiety that is in part a reaction to the stress associated with the tinnitus. His hearing issues have been stable since 2015, and his emotional issues have never been of sufficient severity that his treating providers have ever recommended treatment more frequent twice per month, and typically only once per month. There has never been provided documentation of objective standardized assessment of cognitive or psychiatric status. We agree that there is insufficient evidence to support the presence of functional impairments requiring any restrictions or limitations in the claimant's ability to function. Dr. Clark does support, however, the repeated recommendations that the claimant wear ear protection especially in loud environments. Please see Dr. Clarke's report for details.

(*Id.* at 322.)

The Fifth Circuit has instructed that "a 'plan administrator does not abuse its discretion by making a reasonable request for some objective verification of the functional limitations imposed by a medical ... condition.'" *Dudley v. Sedgwick Claims Mgmt. Servs. Inc.*, 495 F. App'x 470, 475 (5th Cir. 2012) (quoting *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 514 (5th Cir. 2010)). Further,

> the experts here were not required to accept the opinion of [Plaintiff's] treating physician that his symptoms rendered him incapable of performing his job.  This

> was neither arbitrary nor an abuse of discretion: the administrator, under the established standard of review that restricts the courts, was not obliged to accept the opinion of [Plaintiff's] physicians. In this battle of the experts, the administrator is vested with discretion to choose one side over the other.

*Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 513 (5th Cir. 2010). In this case, the independent medical reviewers agreed that there was a lack of objective medical evidence for the treating physicians' recommendations and conclusions relating to Mr. Caskey's mental health. The independent medical reviewers agreed with Plaintiff's treating physician that ear protection was a permanent restriction. Prudential had the discretion to choose one side over the other. Under the standard of review that restricts the Court, the Court cannot say that Prudential made an arbitrary decision or that its decision was not supported by substantial evidence. In total, the Court agrees that Prudential's decision to terminate benefits was supported by substantial evidence.

### d. Whether Prudential's decision was arbitrary and capricious

Plaintiff argues that the decision to contact Oxy days before the "own occupation period" concluded demonstrates that Prudential made an arbitrary and capricious decision not supported by the medical evidence. The Court does not agree for the reasons discussed above. "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Holland*, 576 F.3d at 246–47. In this case, there is a rational connection between Prudential's decision and the facts in the administrative record. The administrative record shows that Plaintiff required hearing protection in noisy environments and noise breaks of 15 minutes every two hours when he was exposed to a loud noise environment. As found by the independent reviewers, the mental health records do not support any limitations to Plaintiff's ability to work in his occupation. Therefore, given that Plaintiff's work was primarily confined to an office space, and hearing protection was required in loud

noise environments, there is a rational connection between the evidence and Prudential's decision.

Plaintiff argues that it was an arbitrary and capricious decision to insist that Plaintiff could work at his own occupation, when that occupation would worsen his hearing loss. In support, Plaintiff cites, *Moore v. Life Ins. Co. of N. Am.*, 2011 WL 10453967, at *5 (E.D. La. Nov. 28, 2011) (abuse of discretion for insurer to disregard housekeeper's job duties including exposure to airborne contaminants when she suffered from severe COPD); *Lasser v. Reliance Standard*, 146 F.Supp. 619 (D.N.J. 2001); *affirmed* 2003 US App. Lexis 19345 (3d Cir. 2003) (stress from work presented unacceptable risk of another heart attack); and *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F. 3d 801 (6th Cir. 2002) (plaintiff's condition was highly susceptible to the stress of her work, a factor never considered by the insurer). Unlike the cases cited by Plaintiff, Prudential did consider the exposure to loud environments, including the decibels of his actual work environment and the personal protective equipment Oxy mandated all employees to wear. Because there is evidence that Prudential considered this factor, and there is evidence that Plaintiff could work in this environment without worsening his hearing, the Court finds that the Prudential's decision was not arbitrary and capricious.

### e. *Prudential's decision was not an abuse of discretion*

In total, Plaintiff has failed to show that Prudential abused its discretion when it terminated Plaintiff's benefits. Prudential's decision was supported by substantial evidence, and was not arbitrary and capricious.

<u>CONCLUSION</u>

Accordingly,

IT IS ORDERED that The Prudential Insurance Company of America's Motion for

Summary Judgment (Doc. 37) is GRANTED.

Signed in Baton Rouge, Louisiana, on July 20, 2020.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**